# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### February 13, 2003 Session

## JAMES KENT PYLANT v. KAREN CARDIN SPIVEY

**Appeal from the Chancery Court for Giles County**
**No. 5246     Robert L. Holloway, Judge**

---

**No. M2002-00602-COA-R3-CV - Filed December 31, 2003**

---

This appeal involves a dispute over the extent of a father's obligation, under a provision in a property settlement agreement, to pay for his daughter's college education. The daughter chose to attend an expensive private college. The trial court found that father should pay tuition equivalent to the cost of an out-of-state public university. Both parties appealed. We affirm the trial court's decision that the father is obligated to pay reasonable costs, but vacate the judgment because there is insufficient proof of such costs.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Vacated in Part, and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and MARIETTA SHIPLEY, SP. J., joined.

W. Charles Doerflinger, Lawrenceburg, Tennessee, for the appellant, James Kent Pylant.

Joe W. Henry, Jr., Pulaski, Tennessee, for the appellee, Karen Cardin Pylant (Spivey).

## OPINION

James Kent Pylant and Karen Cardin Pylant (now Spivey) were divorced on September 8, 1982 at a time when their daughter, Kacey Pylant, was four months old. As part of the court's order, Ms. Spivey was awarded custody of the minor child, with Mr. Pylant having reasonable visitation privileges and a child support obligation. The final order of divorce acknowledged that the parties had entered into a property settlement agreement that adjudicated their property rights and custody of their daughter "in complete fullness and fairness" and that the agreement was "voluntarily and knowingly entered into by both parties."

The order at Paragraph 11 provided: "That the plaintiff (Mr. Pylant) shall be responsible for the college education of the minor child even above and beyond the age of 18 years old at the college

of the minor child's choice." This paragraph reflected a provision in the handwritten (by Ms. Spivey) agreement that stated, "Education - college of Kacey's choice - Kent's responsibility."

In the intervening years, the parties resorted to the courts over child support and visitation issues on several occasions, the last time resulting in an order entered in August of 2000 finding Mr. Pylant in arrears in his child support in the amount of $4,325.22.

The proceeding which is the subject of this appeal was begun by the filing by Ms. Spivey of a complaint for Declaratory Judgment in October of 2000 in which she asked the court to declare the rights and obligations of the parties under the college education provision of the divorce decree and settlement agreement. The complaint alleged that the parties' child, Kacey, had elected to attend Vanderbilt University, had started school there, had been invoiced for $15,575, and that Mr. Pylant, despite demands, had refused to pay these expenses.

No evidence was taken at the trial; instead, the matter was submitted on the depositions of the parties and their daughter.[1] From those depositions, we glean the following facts.

## I.

The economic circumstances of the parties since 1982 are in marked contrast. Karen Spivey has prospered in large measure because of her one-third interest in her family's business, Cardin Distributing Company. She draws $80,000 per year in dividend income from the corporation and owns some investment property. Her current husband also works in the family business, drawing a salary of $150,000 per year.

At the time of the divorce, Kent Pylant was employed at his then wife's family business, Cardin Distributing, earning $70,000. Since the divorce, his salary reached that level again only once and only for a brief time. Over the last eighteen years, Mr. Pylant has been employed by fourteen different employers earning annual incomes varying from $10,000 per year to $70,000 per year.[2] In 1992, Mr. Pylant invested $50,000 in a business in an attempt to increase his earnings, but the business failed and he lost his investment which had come from his 401K plan and a joint savings account. At the time of the hearing in this case he was employed by Ad-Tech Solutions earning a salary of $50,000 per year. His current wife earns $41,000 per year at Cypress

---

[1]On appeal Mr. Pylant asserts that the trial court did not allow him to present evidence. The record of the hearing before the trial court does not support this assertion. During a colloquy between the court and counsel about the time required to put on proof and about the issues involved in construing the agreement, both attorneys offered to submit the case on the depositions taken during discovery. The court offered to hear proof, but the parties, through their attorneys, agreed to waive additional proof. The court explained the procedure to Mr. Pylant. The transcript makes clear that the procedure followed by the trial court was agreed to by both counsel and no request to take testimony was made.

[2]Ms. Spivey estimates his average yearly salary to have been $33,700, although she cautions that figure is not presented as exact.

Communications, and they own a home valued at $152,500, which is heavily mortgaged. They also have a son who was age three at the time of the trial.

Kacey excelled in school and became a very talented vocalist. Her interest in music culminated in her decision to study opera in college. She began discussing her college choices with her father during her freshman or sophomore year in high school. She attained an ACT score of 32 and was accepted by many colleges including Middle Tennessee State University, where she won a full academic scholarship.[3] When Kacey informed her father of her choice of the Blair School of Music of Vanderbilt University, a private institution, he protested that he could not afford to send her to Vanderbilt where the costs exceed $35,000 annually. Mr. Plyant wrote Kacey in May of 2000 informing her of a "list of possible [college] choices" he would fund.[4] In July, 2000, Mr. Plyant reminded Kacey of his choices for her and stated in a follow-up letter that "I am working to have the funds available and ready for your registration and wanted to see if you had made a final decision."

Kacey testified that her father had told her for some time, at least from her junior year, that he could not afford Vanderbilt or schools of similar cost. She stated that his statements had an impact on how she looked at colleges, but she chose Vanderbilt for other reasons and that financial factors were not the most important factor to her. She believed the cost of Vanderbilt to be about $30,000 per year and stated she had no idea how much money her father earned. When told he made around $50,000 per year and asked if $30,000 tuition on that salary sounded reasonable, she stated, "I guess it doesn't sound reasonable when you say it that way, but I also think that there are probably ways of paying for it . . ."

During her college search and application process, Kacey's mother told her that she, the mother, could afford Vanderbilt. Kacey stated that her mother had told her that if Vanderbilt was the place for her then she should go there. Kacey guessed that her mother was actually paying for Vanderbilt. Ms. Spivey testified that she was aware of Kacey's discussions with her father and her father's statements that he could not afford Vanderbilt. Regarding her actions and advice to Kacey during the college selection process, Ms. Spivey testified as follows:

> Question:     Did you have a discussion with Kacey about attending Vanderbilt University and how that would be paid for?

---

[3]Kacey testified in her deposition that in addition to Vanderbilt, she looked at the Juilliard School of Music, Florida State University, Westminster Choir College, Mannes School of Music, Manhattan School of Music, Oberlin Conservatory, Northwestern University, Middle Tennessee State University, University of Alabama and University of Georgia. She was accepted at Vanderbilt, University of Kentucky, Florida State University, Middle Tennessee State University, and Westminister College Choir.

[4]The colleges listed were University of Tennessee at Knoxville, Middle Tennessee State University, University of Memphis, University of Tennessee at Chattanooga, University of Tennessee at Martin, Tennessee Tech, Austin Peay University, University of Alabama (both Huntsville & Tuscaloosa), Georgia State University (where she could live with her father and commute), and University of Georgia (Athens).

3

Answer:      I tried not to talk to her a whole lot about the financial part of it. I felt like that was between myself and her father.

Question:      Did you have any discussions with Kent about Vanderbilt University before she applied to Vanderbilt?

Answer:      No, because I knew she was talking with her father.

Question:      And you heard her testify that every time she talked to her father about Vanderbilt that he told her he could not afford Vanderbilt.

Answer:      Correct

Question:      And is that what she reported back to you?

Answer:      Yes

Question:      And what, if any, discussions did you have with Kacey in light of that response from her father?

Answer:      I told her that we had an agreement in our divorce that she was to attend the college of her choice and that I wanted her to pick, based on that, where she wanted to go.

Question      Did you ever - - In light of those reports back from Kacey did you ever either call or write or contact Kent to discuss the financial aspects of her attending Vanderbilt University?

Answer:      I don't think so.

*****

Question:      When Kacey came to you and told you that her father said he could not afford Vanderbilt University what , if any, response did you have to Kacey"

Answer:      My response was probably that we would go to court. . . . .

Over her father's objections, but with the financial support of her mother and stepfather, Kacey enrolled at Vanderbilt University.[5] Mr. Plyant refused to pay any of her college expenses at Vanderbilt.[6] Subsequently, Mrs. Spivey filed this declaratory judgment action.

At trial, Ms. Spivey took the position that the obligation of Mr. Pylant under the property settlement agreement was clear and unambiguously compelled Mr. Pylant to pay the college expenses at any college chosen by Kacey. Mr. Pylant agreed that he was obligated under the agreement to pay the college expenses of Kacey but stated that such expenses should be limited to those of a state institution or similarly low cost institution in keeping with his ability to pay. Mr Plyant insisted that he should have had input into Kacey's choice of college and that her selection of Vanderbilt would bankrupt him.

After setting forth the evidence presented, the trial court found:

---

[5] Kacey received a $3,000 vocal scholarship to Vanderbilt. In addition, her grandfather Cardin had set aside $12,000 in trust for Kacey's college which was used to help pay her first year tuition.

[6] The trial court permitted Mr. Plyant to file an affidavit stating that on November 19, 2001, Mr. Plyant paid $8,000 toward Kasey's college tuition.

4

Mr. Pylant's position is basically that at the time he entered into the property settlement agreement, he did not intend for Kacey to be able to attend any college she chose regardless of cost and that he currently does not have the ability to pay for the cost of an education at the University of Vanderbilt. Mrs. Spivey argues that Mr. Pylant contracted to pay for his daughter's education at the college of her choice, that he knew that he was financially responsible for that education and that he did nothing to prepare for that expense.

Mr. Pylant does not present a very sympathetic figure to the Court. Even though he knew he was financially responsible for college, he has given his daughter only Twenty Dollars ($20.00) while she has been at Vanderbilt. He apparently had problems paying his child support as ordered. In nineteen (19) years, he has saved nothing to help him pay for his daughter's education. Both Mrs. Spivey and Mr. Pylant attended a private college, Rhodes, and it was foreseeable that their daughter might choose to attend a private college or university. Mr. Pylant's hands are unclean. It is also clear to the Court that Kacey would have more than likely been unable to attend Vanderbilt University if it had not been for the financial ability of her mother. Without that financial ability, Kacey would have been forced to attend a college that her father could more easily afford, or to depend on a combination of what he could afford and financial aid. This statement is not meant to criticize either Kacey or Mrs. Spivey for her choice of Vanderbilt University as the appropriate and best place for Kacey to obtain her education. To the contrary it is simply an observation based on financial information available to the Court.

In Exhibit B to the Petition filed by Mrs. Spivey, Mr. Pylant makes it clear that he is willing to pay for certain universities. The Court finds that a typical state university, including room, board and tuition, would run in the neighborhood of Ten Thousand Dollars ($10,000). An out of state university could cost double that amount. The Court hereby requires Mr. Pylant to pay Twenty-Thousand Dollars ($20,000) per year towards the cost of his daughter's education at Vanderbilt University. The expense shall continue so long as Kacey matriculates towards a degree as a full time student and shall be retroactive from her freshman year.

Neither party was satisfied with the trial court's compromise solution, and both parties appealed. Mr. Plyant argues that the trial court did not set his tuition obligation low enough. In contrast, Ms. Spivey insists that the trial court erred in modifying downward Mr. Pylant's obligation to only $20,000 per year.

## II.

Interpretation of contracts is a question of law. *Guiliano v. CLEO, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of the agreement herein is not entitled to a presumption of correctness on appeal. *Id.*; *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730

(Tenn. Ct. App. 2000). This court must review the document ourselves and make our own determination regarding its meaning and legal import. *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993). Regarding factual findings, our review is also *de novo* upon the record of the trial court, but with a presumption of correctness. Tenn. R. App. P. 13(d); *Cross v. City of Memphis*, 20 S.W.3d 642, 643 (Tenn. 2000).

A property settlement or marital dissolution agreement is essentially a contract between a husband and wife in contemplation of divorce proceedings. *Towner v. Towner*, 858 S.W.2d 888, 890 (Tenn. 1993); *Gray v. Estate of Gray*, 993 S.W.2d 59, 63 (Tenn. Ct. App. 1998). Such an agreement is enforceable, *Holt v. Holt*, 995 S.W.2d 68, 72 (Tenn. 1999), and "is to be construed as other contracts as respects its interpretation, its meaning and effect." *Bruce v. Bruce*, 801 S.W.2d 102 (Tenn. Ct. App. 1990) (quoting *Matthews v. Matthews*, 24 Tenn. App. 580, 593, 148 S.W.2d 3, 11-12 (1940)).

While a parent generally has no legal duty to support a child past the child's majority, *Blackburn v. Blackburn*, 526 S.W.2d 463, 465 (Tenn. 1975), a parent may contractually extend his or her support obligation beyond that imposed by law. *Penland v. Penland*, 521 S.W.2d 222, 224 (Tenn. 1975); *Hawkins v. Hawkins*, 797 S.W.2d 897, 898 (Tenn. Ct. App. 1990). Payment of college expenses is an appropriate subject for an agreement between a husband and wife going through a divorce. *Penland*, 521 S.W.2d at 224; *Hathaway v. Hathaway*, 98 S.W.3d 675, 678 (Tenn. Ct. App. 2002). Such an agreement is binding on the parties and constitutes "a contractual obligation outside the scope of the legal duty of support during minority and retains its contractual nature . . . " *Penland,* at 224; *Hathaway*, at 678. As with property settlement agreements generally, one that includes a provision on college expenses is subject to the same rules of contract interpretation as any other contract. *Hathaway*, 98 S.W.3d at 678.

In the case before us, Mr. Pylant does not dispute that he undertook the contractual obligation to be financially responsible for his daughter's college expenses. It is the extent or scope of that obligation that is in dispute. Mr. Pylant believed that he would share in the decision making as to Kacey's choice of college and that his ability to pay would be a limiting factor on her choice if he was to be expected to be solely financially responsible. He testified that he thought the words "college of her choice" meant a school that she chose that was acceptable to both him and his daughter. He asserts that his obligation under the agreement must be interpreted by using a reasonableness standard and that it is not reasonable to expect a person who earns $50,000 per year to pay $35,000 in college expenses.

"The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The purpose of interpreting a written contract is to ascertain and give effect to the contracting parties' intentions, and where the parties have reduced their agreement to writing, their intentions are reflected in the contract itself. *Id.*; *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). Therefore, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the

usual, natural, and ordinary meaning of the language used. *Guiliano*, 995 S.W.2d at 95; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975).

Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes; but, where a contractual provision is ambiguous, *i.e.*, susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. *Planters Gin Co.*, 78 S.W.3d at 890. In that situation, courts must resort to other rules of construction, and only if ambiguity remains after application of the pertinent rules does the legal meaning of the contract become a question of fact. *Id.*

Thus, courts defer to the contracting process by enforcing written contracts, which establish the rights and obligations of the parties, according to their plain terms without favoring either contracting party. *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985); *Hardeman County Bank v. Stallings*, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995). Courts must avoid rewriting an agreement under the guise of interpreting it. *Marshall v. Jackson & Jones Oil, Inc.*, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1998). The courts will not make a new contract for parties who have spoken for themselves, *Petty v. Sloan*, 197 Tenn. 630, 640, 277 S.W.2d 355, 359 (1955), and will not relieve parties of their contractual obligations simply because these obligations later prove to be burdensome or unwise. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002).

The foregoing authority indicates that where the parties have unambiguously set out the terms of their agreement, courts will enforce those terms as written, regardless of any inequity arising from that enforcement. On the other hand, courts may incorporate a reasonableness requirement into any contract. *Moore v. Moore*, 603 S.W.2d 736 (Tenn. Ct. App. 1980). In *Moore*, this court was called upon to interpret a provision in a real estate sales contract that made the contract contingent upon the buyer's "ability to obtain adequate financing." The proof showed that although the buyer was unable to secure financing in Shelbyville, where the property was located, he was able to obtain adequate financing in Nashville. In this factual context, the court stated that, "a qualifying word which may be read into every contract is the word 'reasonable,' or its equivalent 'reasonably.'" *Id.* at 739. Consequently, the court interpreted the contingency as meaning "reasonable ability to obtain sufficient financing by ordinary, recognized means." *Id.* The court then found that the contract was subject to reasonable application of the words used therein "according to the known situation of the parties," but was not ambiguous. *Id.*

The *Moore* court's language that reasonableness may be read into every contract has been quoted, cited, and applied in a number of cases decided by this court. *See, e.g.*, *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 892 (Tenn. Ct. App. 1995) (holding that insurance company's demand for production of financial records and assertion that insured's failure to produce was a breach of the cooperation clause of the insurance contract could be considered unreasonable). In fact, in some instances, we have stated that the qualifying word "reasonable" *must* be read into every contract. *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993). In *Minor*, because the contract did not include a time for performance, a reasonable time was implied, based upon *Moore*

and upon the well-settled rule that missing contract terms may be implied.  *Id*.  In *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 198 (Tenn. Ct. App. 1991), this court held that "the extent of contractual obligations should be tempered by a 'reasonableness' standard," citing *Moore*.

This court has had the opportunity to apply these rules of contract interpretation in the context of an agreement to provide college expenses in a number of cases.  While some of them have involved determinations of specific portions of the agreement language not here present, more than a few have specifically addressed the reasonableness of the expenses.  For example, in *Cagle v. Cagle*, No. 02A01-9710-CH-00265, 1998 WL 802019 (Tenn. Ct. App. Nov. 18, 1998) (no Tenn. R. App. P. 11 application filed), the father argued, among other things, that his agreement to pay for his son's "college expenses" should be interpreted to require him to pay only the reasonable costs of that education and also that the term "college" as used in the agreement should be interpreted as meaning "public college."  With regard to the second issue, this court held: the agreement itself did not limit college to apply only to public colleges; the father could have limited the term "college" in the agreement but did not; the father failed to prove a mutual understanding at the time of the agreement that the term would be limited to public colleges; and the ordinary meaning of the term "college" included private as well as public colleges.

With regard to the father's reasonableness argument, the court recognized that his contractual obligation was subject to "an implied condition of reasonableness," citing *Moore*. Id., at *3.  The father had paid expenses for the son to attend a public university the year before, and testified that the costs at the private school the son transferred to would be essentially the same if he did not provide extras he had provided earlier, such as a car.  Additionally, this court found that the evidence did not preponderate against the trial court's finding that the cost at the private school in question was "a reasonable cost of obtaining an education."  *Id*., at *4.  Consequently, this court found that the private college was a reasonable choice within the terms of the agreement.  *Id*.

Our review of decisions regarding agreements to pay for college reveals that this court has consistently held that such an obligation is subject to an implied condition of reasonableness, at least where no specific college or amount of expenses is set forth.  In  *Hathaway*, the court stated that 'reasonable' must be read into the contract contrary to the trial court's finding that the father's failure to place a limitation in the agreement required him to pay all tuition "no matter how much or how difficult."[7]  98 S.W.3d at 679.  The court also discussed with approval prior decisions holding that "just because the agreement contained no limitation on the defendant's obligation, that did not mean the child 'could attend any college, regardless of the cost.'" *Id.*, 98 S.W.3d at 680, quoting *In re Marriage of Schmidt*, 684 N.E.2d 1355, 1362 (Ill. App. 1997).

In *Wilson v. Wilson*, No. 03A01-9610-CH-00322, 1997 WL 360670 (Tenn. Ct. App. June 30, 1997) (no Tenn. R. App. P. 11 application filed), this court agreed that the marital dissolution

---

[7]The agreement in *Hathaway* actually used the term "reasonable" in describing the tuition expenses to be paid. The court, nonetheless, stated that the *Moore* rule would apply even if the agreement did not limit the expenses to those that were reasonable.

agreement language requiring the father to pay "expenses of a college education" was subject to an implied condition of reasonableness, *Id.*, at *1, but determined that it need not examine the reasonableness of the expenses at issue because the father had in fact provided the items included in those expenses. Similarly, in *Cooper v. Cooper*, No. W1999-01450-COA-R3-CV, 2001 WL 29459 (Tenn. Ct. App. Jan. 10, 2001) (no Tenn. R. App. P. 11 application filed), the court noted that the father's obligation to pay for his son's college was subject to an implied condition of reasonableness and that the analysis in such cases had been extended to determining whether the choice of college is reasonable. *Id.*, at *5. Because that issue was not raised in *Cooper*, however, the court found that reasonableness of the choice of college was not relevant therein. *Id.*

The most thorough discussion of the relevance and application of a reasonableness standard to a parent's agreement to pay college expenses of his or her child is found in *Vick v. Vick*, No. 02A01-9802-CH-00051, 1999 WL 398115 (Tenn. Ct. App. June 16, 1999) (no Tenn. R. App. P. 11 application filed). In that case, the marital dissolution agreement provided that the father agreed to be "responsible for the children's tuition, room and board for college education if they choose to go for a four year degree." The provision itself did not limit those expenses to a reasonableness standard. This court examined cases from this state and from other jurisdictions and noted that some courts have refused to limit a parent's obligation where there are no limitations stated in the agreement. *Id.*, at *4. However, the court found more persuasive those cases holding that the obligation was subject to a determination of the reasonableness of the choice of school[8] and held:

> The majority of courts considering this issue, however, will determine if the choice of college is reasonable, considering the child's needs and the parent's ability to pay. This is the approach used by the trial court in this case and is consistent with the contract's implied condition of reasonableness. Therefore, we adopt this approach on appeal.

*Id.*, at *7 (citations omitted).

The *Vick* court found especially persuasive the reasoning of *In re Marriage of Schmidt*, 684 N.E.2d 1355 (Ill. App. 1997). In the *Schmidt* case, the court had found that where a contract was silent as to price, a reasonable price was to be implied.[9] *Id.* at 1361. The Illinois appellate court determined that the cost of the private school chosen by the daughter was unreasonable in light of the father's financial means. The father was ordered to pay one-half (the agreement was for one-half of college expenses) of the educational expenses at a state school. *Id.* at 1364. The *Schmidt* court also

---

[8]In *Vick*, this court found the evidence indicated a significant difference in cost between the private college chosen by the child and a state-supported university, but also found there was no mutual understanding at the time of the agreement that the term "college" was limited to public colleges. 1999 WL 398115, at *7. The court also found that the MDA did not require approval by or consultation with the father on the choice of schools. Noting that some courts would end the inquiry at this point, the *Vick* court decided otherwise.

[9]See also *Ingrassia v. Ingrassia*, 509 N.E.2d 729,737 (Ill. App. 1987) (holding term missing from settlement agreement's college education provision is essentially a price term, so reasonable price is implied).

found there was no evidence that at the time they entered into the agreement the parties intended that their daughter could attend any college, regardless of cost. *Id.* at 1362.

Although the agreement in *Vick* as silent as to who would make the decision of which college the child would attend, we think the reasoning is applicable to the case before us with the result that Kacey's choice of college is subject to a reasonableness standard as far as Mr. Pylant's obligation to pay for it is concerned. This interpretation is consistent with other cases implying a condition of reasonableness in similar contracts.

It is also consistent with those cases holding that where a term is missing from a contract, a reasonable one will be implied. *Minor*, 863 S.W.2d at 54 and cases cited therein; *McClain*, 806 S.W.2d at 198 (where parties omit material provisions from their contract, the courts will impose obligations on the parties "that are reasonably necessary for the orderly performance of the contract."); *see also Floyd v. Floyd*, No. M2000-02344-COA-R3-CV, 2001 WL 997380, at *5 (Tenn. Ct. App. Aug. 31, 2001) (no Tenn. R. App. P. 11 application filed) (holding that where an MDA failed to establish a specific visitation schedule, the implied reasonable standard would be applied). Here, the term missing from the college education provision is essentially a price or cost term, so a reasonable price must be implied. The fact that an agreement does not set a specific amount or otherwise identify a measurable limit does not mean that the obligation is unlimited or that the child can unilaterally obligate the parent to pay an unreasonable amount.

Further, in construing contracts, courts must look at the language and the parties' intent and impose a construction that is fair and reasonable. *ACG, Inc. v. Southeast Elevator, Inc.* 912 S.W.2d 163 (Tenn. Ct. App. 1995). In *Wallace v. National Bank of Commerce*, 938 S.W.2d 684 (Tenn. 1997), the Tennessee Supreme Court, in examining the duty of good faith in performance that is implied in every contract, discussed with apparent approval a Court of Appeals holding that "a court must judge the performance against the intent of the parties as determined by a reasonable and fair construction of the language of the instrument." 938 S.W.2d at 686. While the case before us does not involve an allegation of failure to perform, it does ask the court to define the scope or extent of performance required. We think the Supreme Court's holdings in *Wallace* are relevant to that definition and are consistent with the principle that reasonableness will be implied in a contract, at least where a material term is missing.[10]

Herein, the parties did not specify the cost of the education or describe it in any quantifiable or measurable way. We will not presume that the parties intended an unlimited obligation. Instead, we presume they intended to establish a reasonable obligation that the father would foreseeably be able to meet. We can imagine scenarios in which courts would not hesitate to refuse to enforce such an apparently open-ended obligation because a child's choice of a particular school was blatantly

---

[10]The Supreme Court also acknowledged prior Court of Appeals holdings to the effect that good faith in performance is measured by the terms of the contract and the parties may, by those terms, establish the standards by which performance is to be measured. The Court determined that the parties in *Wallace* had agreed to specific terms and that performance according to those terms could not be characterized as bad faith. 938 S.W.2d at 687.

unreasonable, either because of the cost of the school or because of the financial situation of the obligor parent. For example, if a child chose to go to a unique and exclusive institution, located for example in Europe, whose cost was prohibitive to all but the most wealthy, we have no doubt that courts would refuse to require a parent of average means to fund that choice. In that situation, the concept of reasonableness would be applied; it is only a matter of degree to also apply it in the situation before us.

For all the reasons stated above, we conclude that Mr. Pylant's contractual obligation to pay for his daughter's college education at a school of her choice is subject to a determination of whether that choice is reasonable in the circumstances.

### III.

Whether the term "reasonable" is written into the contract by the parties or is implied into it by the courts, "reasonable" does not mean unlimited. *Hathaway*, 98 S.W.3d at 679, citing *Moscheo v. Moscheo*, 838 S.W.2d 226, 228 (Tenn. Ct. App. 1992). The answer to the question of what is reasonable will vary according to the circumstances. *Moscheo*, 838 S.W.2d at 227

In *Moscheo*, the father agreed to pay a reasonable college tuition. The child in that case had enrolled in a private out of state college, and the father agreed to pay the tuition if the daughter did reasonably well. He paid for $7000 for one semester, and the student transferred to Belmont College where she could live at home and work part time. The father paid $2690 tuition for one semester with a condition that the student maintain a "C" average and work part time. When the daughter then advised her father that she wanted to attend another private college out of state, the father agreed to pay up to a limit of $6,000. He paid that and more for the first semester, but refused to pay for the next semester. The trial court found that the father was only required to pay a reasonable amount each year and that he had paid the amount required.

Based upon evidence that the tuition in state colleges for the relevant school year was between $1,000 and $2,000 per year and tuition at private schools was much higher, this court found that $6,000 was a reasonable amount of tuition under the circumstances of the case, because "It is in the middle range between the cost of tuition at a good state-supported university and a moderately priced private institution." *Id*. at 228. The court did not directly address the father's financial ability to pay, and we must assume it was not raised as an issue.

The general rule, however, is that the obligor parent's ability to pay is an important consideration in determining the reasonableness of the choice of college for which that parent is expected to pay. In *Hathaway*, this court held that the trial court erred in holding that the father's income and ability to pay were not to be considered and further erred in limiting the father's proof to that of impossibility. 98 S.W.3d at 681.

In determining whether a child's choice of college is reasonable, both the child's needs and the parent's ability to pay must be considered. *Id*. at 680; *Vick*, 1999 WL 398115, at *7. Even where,

11

as in the case before us, the chosen college is an excellent fit for the child,[11] the ability of the parent to pay must also be considered. *Hathaway*, 98 S.W.3d at 681.[12]   What is reasonable may vary according to the financial situation of the parties involved.  "[A] tuition amount need not be outrageous in order to be unreasonable.  If parents cannot pay what one may consider a modest tuition, that amount is still unreasonable as to them."  *Id*. at 680, quoting *Carlton v. Carlton*, 670 So.2d 1129, 1130 (Fla. Ct. App. 1996).

Reasonableness must be viewed in light of the parties' situation at the time of the making of the agreement as well as at the time it becomes due. *Hathaway*, 98 S.W.3d at 680-81; *see also Vick*, 1999 WL 398115, at * 8 (considering the cost of the college selected and the father's annual income at that time).  When a court is called upon to supply a missing term with a reasonable one, it must consider the subject matter of the contract, the situation of the parties, their intention in what they contemplated at the time the contract was made, and the circumstances attending the performance. *Minor*, 863 S.W.2d at 54.

From the transcript of the hearing, it is clear that the trial court understood that it would have to determine reasonableness and would also have to determine whether the father's ability to pay was a factor that must be considered.  Although the final order does not clearly state the findings in those terms, it appears to us that the trial court did consider reasonableness and determined that the cost of an out of state public school was reasonable.  Whether the father's ability to pay played a part in that determination is not clear.

The parties' testimony regarding their understanding or expectation at the time the agreement was signed demonstrates that there was no agreement as to the extent of the obligation under the provision.  In fact, Ms. Spivey testified that at the time of the divorce, there were no negotiations or discussions leading up to the handwritten provision that Kent would pay for Kacey's college.  While the trial court found that it was foreseeable at that time that their daughter might choose a private college, that does not really address the question of their reasonable expectations.  The cost of a private education at the school attended by the parties would likely have been a smaller percentage of Mr. Pylant's $70,000 per year salary than the costs at Vanderbilt today are of his current and recent salary.  In addition, Mr. Pylant's education was supplemented by partial scholarships.  It was not unforeseeable that their child would also receive scholarships.  In fact, her high school record and

---

[11]Kacey explained her choice of Vanderbilt.  She was an excellent student with close ties to her voice teacher at the Blair School.  While some of the other schools she considered may have had better ranked music departments, because Vanderbilt did not have a graduate music program, she knew she would not have to compete with graduate students for opera parts. In addition, the university was near both her home and her counselor.

[12]The court in *In re Schmidt* recognized the unique situation divorced families face in dealing with post-majority college arrangements and considered how the college decision would have been made had the parents remained married, stating, "The only way to determine a reasonable price would be to use the same factors two married parents would use." *In re Schmidt*, 684 N.E.2d at 1362.

accomplishments qualified her for merit based scholarships at some schools, ranging from a full scholarship at a state school to a small grant at Vanderbilt.

Kacey's eligibility for need based scholarships raises other questions. The trial court found that Kacey had applied for various financial aid, but because of her mother's financial situation almost all were denied. The record includes no information on this issue other than Kacey's testimony. It would have been useful to know what kind of or how much financial aid would have been available to Kacey based on Mr. Pylant's financial situation,[13] especially in view of Ms. Spivey's position that Mr. Pylant should be responsible for paying the entire cost of Kasey's education at Vanderbilt.

On appeal, Ms. Spivey vigorously argues that Mr. Pylant should have saved for the cost of Kacey's education. While that is no doubt true, based on the evidence in the record we are not convinced that a person with Mr. Pylant's income, which Ms. Spivey estimates to have averaged about $34,000 per year, could have saved enough to fund an education at the cost of the school chosen by Kacey. The record is devoid of any proof from which we could draw any conclusion on this question or adequately consider it in a reasonableness determination.

Mr. Pylant asserts he should only have to pay the equivalent of the cost of a state school. The trial court found that he had provided a list of schools he could fund. That list included Tennessee public colleges, where presumably Kacey would only have to pay instate tuition and fees, and some public colleges in other states, some in Georgia where Mr. Pylant lives. The record does not include any information on the costs of the schools on the list.

We agree with the trial court that the father's providing a list to Kacey of the schools he could pay for removes any argument he might make regarding his inability to pay with regard to those schools. However, we are unable to conclude that the trial court's holding that Mr. Pylant was obligated to pay the equivalent of an out of state public college tuition in the amount of $20,000 is supported by the record because there is simply no evidence regarding the costs of the schools on the list or the general cost of public colleges in state and out of state. *See Hathaway,* 98 S.W.3d at 681.

We find that Mr. Pylant is obligated to pay the reasonable cost of a college education for his daughter. While the daughter may choose to go to a school whose cost exceeds a reasonable cost, Mr. Pylant is obligated to contribute to her education that reasonable cost. We further find that, by his own admission, Mr. Pylant has the ability to pay the costs of the schools on the list he provided to his daughter, which the trial court referred to as Exhibit B. Thus, those costs are reasonable as to the parent's ability to pay.

---

[13]For example, proof from a financial aid officer or other qualified person regarding the amount of aid available to a student based upon Mr. Pylant's income and resources would be instructive and a factor in considering reasonableness. By placing Kacey in the financial shoes of the obligor parent, a more realistic picture may have been developed.

However, we have no basis upon which to conclude whether the cost of each or any of the schools on the list is reasonable or unreasonable as compared to college costs in general. Additionally, we have no basis for determining whether $20,000 represents the actual cost of any of those colleges. Consequently, we must vacate the judgment of the trial court. On remand, if the parties are unable to agree on the costs of the colleges on the list provided by Mr. Pylant to Kacey, the court should, after an evidentiary hearing, determine the actual costs of the colleges, the reasonableness of those costs, and the reasonable amount Mr. Pylant must pay based upon that information.

Costs of this appeal are taxed equally between the appellant, James Kent Pylant and the appellee, Karen Cardin Pylant Spivey.

_____
PATRICIA J. COTTRELL, JUDGE