Cynthia Thuma ROHN,
Appellant-Petitioner,

v.

Edison L. THUMA, Appellee-Respondent.

No. 2–577A174.

Court of Appeals of Indiana,
Second District.

Aug. 12, 1980.

Edward O. DeLaney, Donald E. Knebel, Barnes, Hickam, Pantzer & Boyd, Indianapolis, for appellant-petitioner.

James P. Quinn, Buck, Berry, Landau, Breunig & Quinn, Indianapolis, for appellee-respondent.

SULLIVAN, Judge.

Cynthia Rohn appeals from a ruling by the trial court upon her Petition for Citation of Contempt of Court which sought a finding of contempt against Edison Thuma for failure to make certain child support payments.

Rohn and Thuma were divorced on June 26, 1967. The decree incorporated an agreement providing for the support of the couple's two children, Nathan and David, then ten and nine years of age, respectively. The pertinent portion of the decree reads as follows:

> "The Husband agrees to pay directly all extraordinary medical bills not covered by such insurance and all extraordinary dental bills for services rendered to the Children. Such dental services shall be at the approval of the Husband but such approval shall be granted upon consultation with and recommendation by a qualified dentist to be selected by the Husband. The Husband further agrees to provide each Child with a four year undergraduate college education, if the Husband is financially able to do so and if the Child desires to go to college and is mentally qualified to secure admission. In such case the Husband will pay the tuition, fees and books".

On October 20, 1976, Rohn filed her petition for citation of contempt, alleging that Thuma had failed to make support payments relating to college expenses and dental bills. The trial court entered the following order after hearing evidence on the petition:

> "The Court finds that the Defendant [Father] is in compliance with the provision in [the] Decree that he provide each child with a four-year undergraduate college education; however he is ordered to reimburse the Plaintiff [Mother] for $600.00 extraordinary dental bills incurred by the Plaintiff on behalf of one of the children".

## I.

### College Expenses

In the fall of 1976, nine years after the divorce, David and Nathan decided to attend college. Both were gifted students and had graduated at the top of their high

school class. Nathan chose to matriculate at Vassar College in New York while David decided to attend the University of Chicago.

Tuition, books, room and board and miscellaneous expenses for Nathan's first year at Vassar totalled $6,155. David's first-year expenses for the same items at Chicago totalled $5,937. The expenses for both sons therefore equalled approximately $11,-992 of which $7,117 represented tuition and books.

The above expenses were defrayed in part by $1,000 scholarships received by each son, by $1,000 earnings of each son, by gifts of $1,800 to each son from their grandfather, and by $140 per month support allowance for each son paid by Thuma. The deficiency in educational expenses after application of the above items approximated $3,732.

In October of 1976, Thuma sent a check to each son for $481, said total representing Thuma's determination of the amount required for tuition and books for one semester at Indiana University. Thuma further testified that he intended to give Nathan and David the same amount for the second semester.

The dispute concerning the amount of college expenses payable by Thuma centers upon the interpretation to be given that portion of the decree which provides that "[t]he Husband further agrees to provide each child with a four year undergraduate education, if the Husband is financially able to do so and if the child decides to go to college and is mentally qualified to secure admission."

Rohn argues that such language is unambiguous in its requirement that Thuma pay for expenses incurred in obtaining an education at *any* college chosen by each son. Thuma contends that such language necessitates only that he contribute the amount required for a reasonable college education, and that by submitting the amount equal to the cost of tuition and books at a state university, he has fulfilled his obligation.

Our review of this issue is narrowly circumscribed by the manner in which Rohn has sought to enforce her interpretation of the pertinent language in the decree. This is not a proceeding for modification of the decree due to a change of circumstances. Both parties agree that the decree imposes an obligation on Thuma which is separate and distinct from any obligation to supply an education absent an express agreement on the subject. *See DeLong v. DeLong* (2d Dist. 1974) 161 Ind.App. 275, 315 N.E.2d 412. The question presented here is what constitutes a "four-year undergraduate education" as described by the decree.

Rohn petitioned the trial court to hold Thuma in contempt for failure to comply with *her* interpretation of what is, in our opinion, an ambiguous provision. An analogous set of circumstances was before the court in *Johnstone v. Johnstone* (1939) 226 Iowa 503, 284 N.W. 379. There the parties were granted a divorce in 1931, pursuant to a decree which incorporated the following agreement concerning educational expenses:

"During any year that either child is so away at boarding school or college, the Second Party shall wholly support, maintain and clothe such child and pay all expenses of schooling. The Second Party further agrees to pay the reasonable charges for the tuition or school expense of said children, such as music lessons or other similar instruction, provided that before incurring such expense, First Party shall inform Second Party of the nature of the proposed instruction and the probable cost thereof." 284 N.W. at 381.

In the *Johnstone* case, in 1937 the son of the couple decided to attend Dartmouth College. The father suggested that the son go to the University of Wisconsin, the latter school requiring less tuition. The mother nevertheless sent the son to Dartmouth. The father tendered only the amount equivalent to the tuition at a state university. In response, the mother petitioned the trial court to find the father in contempt for failure to abide by the terms of the agreement.

The trial court denied the mother's petition for contempt, and the appellate court affirmed, stating:

"We believe the lower court was right in refusing to issue a contempt order, for it is obvious from an examination of the record that the appellee was not wilfully in disobedience of the decree of the court. This court has held that a party will not be adjudged to be in contempt of court unless his disobedience is wilful, and proof of guilt must be clear and satisfactory.

.    .    .    .    .

At no time did the appellee refuse to contribute to the education of his son. There was an honest and genuine disagreement between the parties respecting the college which the son should attend, and the amount of money that should be expended upon his education. Appellee informed appellant that he would not contribute over $100 per month towards the son's college education. There were many colleges of standing the son could have attended without incurring a greater expense than this. It was appellant's desire, and no doubt Lewis' also, that he go to Dartmouth. From an examination of the expenses listed in this record it is evident that a boy desiring to attend Dartmouth could do so and enjoy all of the ordinary benefits on $100 a month. That appellee was willing to carry out the agreement as to college education is shown by the fact that around the first of each month he tendered a check for the sum of $100. Under the appellant's construction of the contract she would have the right to choose the school that the son would attend, and appellee under the contract would be guilty of contempt unless he paid the expenses incurred. It might be Oxford or some school in some foreign land, where the expense would run into the thousands of dollars, which in the appellant's judgment was the proper institution for the son to attend. That a college education is desirable is not questioned by anyone. However, the cost of that education must not exceed an amount that the party liable for it is able to pay. That the appellee was willing and desired the son to have a college education is evident from the record be-

fore us. The distinguished and able trial judge had the witnesses before him. He was familiar with the entire situation, and we believe he was right in refusing to cite appellee for contempt." 284 N.W. at 382.

The court further stated:

"And so in the case at bar, under the terms of the contract, the appellee is required to pay for the college education of his two children. However, the question of what college they shall attend, and the cost of the college education, is one which under the terms of the contract, as the lower court held, should be the subject of agreement between the parties. Since they were not covered by the original agreement they must be left to the future agreement of the parties or the determination of the court. Certainly, until these matters are determined, no court will grant an order requiring specific performance." 284 N.W. at 383.

This view if compatible with Indiana law. In *State ex rel. Davis v. Achor* (1947) 225 Ind. 319, 75 N.E.2d 154, the trial court ordered the ex-wife to show cause why she should not be held in contempt for interfering with the court's order granting the husband custody of the children. Our Supreme Court, in prohibiting the trial court from taking further action to enforce its order, stated:

"[A] judge should not make ambiguous records, but if he does so inadvertently and the term of the court ends before he discovers the ambiguity, and the parties have made conflicting claims in reliance upon the ambiguous records so made, the ambiguity may be clarified upon proper application, notice and hearing.    .    .    . [citations omitted]    .    .    . Even then it would be a harsh application of the law to cite a party for contempt for acting in good faith in obedience to the ambiguous order,    .    .    .." 75 N.E.2d at 158.

In the case at bar, Thuma has in good faith rendered what he considers payments constituting full compliance with the decree. The trial court was correct in deny-

ing the contempt portion of Rohn's petition, since Thuma evidenced no wilful disobedience of the decree.

Rohn, in addition to petitioning for contempt, sought that Thuma be ordered to pay the sum of $6,000 for the educational support obligation. The court below did not so order and instead found that Thuma "is in compliance with the provision in Decree that he provide each child with a four-year undergraduate college education." The court, in announcing its decision, explained:

"Well . . . I am afraid that I disagree with you on the essential principles and premise of the case. I feel that in tendering the tuition fees and books at I.U. he does everything that this decree says he has to do.

. . . . .

It is a disagreement on principle I guess." The order entered by the trial court is susceptible to only one interpretation, i.e., that as a matter of law, a parent's obligation to provide an undergraduate education to a child is fulfilled in every case by tendering the amount equal to the cost of a state university. The law does not comport with such a rigid rule. Rather, the nature, quality, and expense of a given institution of higher learning for which a parent may be liable depends upon a myriad of factors. Accordingly, the liability of a parent must be determined on a case by case basis after a careful examination of the relevant considerations.

It is well established that a child has a right to be supported in a style consonant with the societal position of his parents. Where circumstances warrant, a child is entitled to more than just the bare necessities of life. *Geberin v. Geberin* (3d Dist. 1977) Ind.App., 360 N.E.2d 41; *Morris v. Morris* (1930) 92 Ind.App. 65, 171 N.E. 386. Similarly, it has been said that a father is "chargeable with providing an education for his child commensurate with his financial ability." *Weingast v. Weingast* (1964) 44 Misc. 952, 255 N.Y.S.2d 341, 343.

In determining the initial appropriate amount of support and in later modifying a support provision where an education provision is *absent*, the courts have considered the needs of the child, the child's station in life, and the financial condition of the father. *See* I.C. 31–1–11.5–12 and 31–1–11.5–17 (Burns Code Ed.Supp. 1979). Such factors clearly governed the Missouri court's decision in *Nelson v. Nelson* where the court stated:

"It is clear from the evidence in this case that Valle is entitled to an allowance for his support in excess of the bare necessities of life. The evidence shows that his father is a man of means, and under the circumstances shown, Valle is entitled to be maintained according to the station in life occupied by a person of his father's financial standing. It is not unreasonable for such a child to be sent to private schools, attend summer camps, and to enjoy certain privileges not usually had by boys whose fathers are not as able to provide such advantages." *Nelson v. Nelson* (Mo.App. 1962) 357 S.W.2d 223, 226.

Similarly, a Pennsylvania court, when faced with a petition for modification of support to cover the son's college expenses, recognized the problem of determining the extent to which a father is obliged to support a child attending a private college when adequate and less expensive education is available elsewhere. In *Commonwealth v. Larsen* (1967) 211 Pa.Super. 30, 234 A.2d 18, the court explained:

"We are reluctant to formulate a rule which would, in all cases, prevent a child from attending the college of his choice simply because it is more expensive than the state-supported university. On the other hand, we do not believe that the child should have absolute discretion in selecting a college, and thereby unilaterally increasing the father's support obligation. The determination of whether such an additional burden should be imposed on the father is a matter for the trial court.

The purpose of a support order is the welfare of the child and not the punishment of the father. It must be fair, not confiscatory in amount and intended to

provide a reasonable allowance for support, considering the property, income and earning capacity of the father, and the station of life of the family. It is within the discretion of the trial court to determine under all the circumstances what is just and equitable to the child and to the father.

.    .    .    .    .

Thus, in a case such as this, the court must first ascertain what advantages are offered by the more expensive college in relation to the child's individual needs, aptitude, ability, and the child's anticipated vocation. It must then weigh these advantages against the increased hardship that would be imposed on the father to determine whether the additional expense is reasonable under the circumstances. We realize that a judge who sees and hears the witness in a case such as this is in a better position than this Court to decide this problem and our function on appeal, therefore, is merely to determine whether the lower court is chargeable with an abuse of discretion." (Citations omitted.) 234 A.2d at 20.

■ We believe that since in the *absence* of any agreement, a father's duty to educate depends upon the social and financial circumstances, so, too, where an ambiguous education provision is *included* in the decree those same social and financial considerations are relevant in determining the limits of a father's financial responsibility.[1] Certainly, there are some instances in which a father would not be overburdened by the cost of a private school and where his child's lifestyle, intellect, and chosen vocation make such a school appropriate. Under such circumstances, a court might reasonably construe "a four-year undergraduate college education" to mean an education at a private school. On the other hand, given a different social and financial setting, a father's financial responsibility may

be fully satisfied by paying the costs of a state facility.

■ In the instant case, the father does not contend that he is financially unable to pay for the costs of Vassar and the University of Chicago. He asserts only that he is, in fact, in compliance with the decree when he tenders the amounts necessary for Indiana University. Since Mr. Thuma's financial ability to pay was not at issue, the court's finding can not be sustained on the basis that the court properly found under the evidence that Mr. Thuma was at that time financially unable to pay more than an amount equal to the expenses at a state institution. Accordingly, the court must have concluded that a "four-year undergraduate education" as a matter of law in every case means the cost equivalent of a four year term at Indiana University. In so doing the court was in error and to that extent the judgment must be reversed.

## II.

### *Dental Bills*

■ The divorce decree in 1967 further provides that Thuma will pay all the sons' extraordinary dental bills for services approved by Thuma and recommended by a dentist of Thuma's selection.

While spending a year in France on a study program, Nathan required orthodontic work costing $600.[2] Upon his return home, Nathan was taken by Rohn to Dr. Stoner, a dentist whom Thuma had approved for work on David. Dr. Stoner told Rohn that the work done on Nathan in France was faulty and would have to be redone at a cost of $1300. Thuma refused to pay any of these bills. Pursuant to Rohn's petition, the trial court ordered Thuma to pay the $600 bill but not the $1300 bill.

Thuma defends his refusal to pay the $1300 on the basis that he was not consulted

---

1. We might note that in drafting any such agreement or proposed support entry, counsel for the parties should be cognizant of the children's long range educational needs and desires and the costs thereof regardless of the ages of the children at the date of dissolution and

should provide accordingly with some degree of specificity.

2. Nathan had broken the arch wire on his braces. Those braces were constructed by Dr. Risk before Nathan left for France. The bill for Dr. Risk's services is not in dispute here.

for approval of either the work to be done or of Dr. Stoner as the dentist for Nathan. We find that, although Rohn did not strictly comply with the terms of the support agreement, such noncompliance was insubstantial and nonprejudicial to Thuma.

The relevant portion of the decree states: "Such dental services shall be at the approval of the Husband but such approval shall be granted upon consultation with and recommendation by a qualified dentist to be selected by the Husband." This clause is clearly designed for the husband's benefit to guard against dental claims involving needless dental work, shoddy workmanship, or exorbitant prices. There is not disagreement between the parties as to the necessity of the work nor as to the competency of Dr. Stoner. In addition, Mr. Thuma does not argue that Dr. Stoner's charges are excessive. Since Thuma gave approval for Dr. Stoner to work on David, and since the work done on Nathan was necessary, we find that the trial court abused its discretion in not requiring Thuma to pay the $1300 bill for services performed by Dr. Stoner.

The judgment is reversed and the cause is remanded for further proceedings consistent herewith.

MILLER (participating by designation) and SHIELDS, JJ., concur.