PAULA A. MANDEL *vs.* SHAWN W. MANDEL.

No. 08-P-18.

Norfolk. November 17, 2008. - June 3, 2009.

Present: KAFKER, COHEN, & TRAINOR, JJ.

*Divorce and Separation,* Separation agreement, Child support, Modification of judgment. *Parent and Child,* Child support, Education. *Words,* "Reasonable college expenses."

This court concluded that a provision in a separation agreement regarding the college expenses of the parties' child was intended to provide each party with a payment obligation of fifty percent of reasonable college expenses, as determined by certain equitable factors; however, where this court could not discern from the record whether the trial court judge gave appropriate consideration to the parties' intentions as expressed in the provision, which was merged into the divorce judgment, this court remanded the matter for a redetermination of the amount of the parties' payment obligations under the circumstances. [351-357]

COMPLAINT for divorce filed in the Norfolk Division of the Probate and Family Court Department on December 8, 1995.

Complaints for contempt, filed on June 5, 2006, and October 23, 2006, were heard by *Beverly Weinger Boorstein,* J., and motions for relief from judgment, to vacate an order of support, and for reconsideration were heard by her.

*Jeffrey N. Moxon* for the plaintiff.

*Shawn W. Mandel,* pro se.

KAFKER, J. In 1996, the parties, Paula Mandel and Shawn Mandel, obligated themselves, in a separation agreement provision incorporated and merged into a divorce judgment, to each pay for one-half of their daughters' "college education expenses." The provision contained no further explanation regarding cost or choice of school, although another merged provision provided both parents with the right to participate fully in their daughters' activities and with input into educational decisions. A

decade later, their older daughter enrolled at a private university costing approximately $34,000 per year. The parties never reached an agreement on payment, and when Shawn refused to pay fifty percent of the cost, Paula initiated contempt proceedings against him. A Probate and Family Court judge eventually found that Paula and the child had selected a school "financially out of reach" for Shawn and ordered him to pay approximately one-quarter of the expenses of the private college. On appeal, Paula claims the judge erred by not requiring Shawn to pay one-half of the expenses actually incurred. Shawn argues that the judge properly limited his obligation to the expenses he would have paid had the child attended a State university. As we conclude that further proceedings regarding the reasonableness of the college expenses in these circumstances are required, we reverse and remand the matter to the Probate and Family Court.

1. *Background.* The parties have two daughters who reside with Paula in Massachusetts. Shawn, now remarried, lives in Arizona with his wife, their son, and his wife's son from a previous relationship. The parties were divorced in Massachusetts in 1996. The judgment of divorce nisi incorporated a separation agreement. Exhibit "A" of the agreement provides that the parents are to share legal custody and that Paula has physical custody and the normal daily care of the children. It also states:

> "Both parents shall participate fully in providing access to the child and her activities, and input into educational, medical, behavioral and other significant decisions affecting the child."

Exhibit "B" of the agreement provides that:

> "The Husband and Wife shall each contribute 50% toward each child's college education expenses, including, but not limited to, room, board, tuition, books, fees and other normal educational expenses."

These provisions, along with other child-related terms, merged into the judgment. (We hereafter refer to these provisions as the college expense provisions.)

In 2006, the parties' elder daughter, Casey, enrolled at Roger Williams University (Roger Williams). The cost of her first

year, after grants, was $34,000. Around that time, Shawn's annual income was $99,996, and his second wife's annual income was $12,376. Paula's annual income was approximately $93,305, and she received $14,300 per year from Shawn in child support. Shawn also paid $160 per week ($8,320 per year) for his wife's son to attend Arizona State University (Arizona State). Shawn likes Roger Williams but during the college search process had requested Casey apply in Arizona for more affordable costs.[1]

In June, 2006, Paula initiated a contempt proceeding against Shawn for failing to pay his portion of Casey's college expenses. Following a hearing on September 15, 2006, at which Shawn did not appear, a Probate and Family Court judge found him in contempt and ordered him to pay Paula $17,000. The following month Shawn filed several motions, including a motion to vacate the September, 2006, order and a motion to hold Paula in contempt. In his motions, Shawn argued that he was not consulted in the college selection process and was denied access to loans.[2]

A hearing on Shawn's motions was held on November 3, 2006. At the hearing, a Probate and Family Court probation officer who investigated the college selection process testified that "I don't think father had the input that he would have liked to have had. I don't think he had as much information as he would have liked to have had." He also reported that Shawn "did have sufficient input that he could have come into court to seek action." Shawn insisted in his defense that he suggested that Casey apply to Arizona State as a resident or to a California State university, but that Paula threatened not to support her or contribute to any

[1]The record reveals little about Casey's willingness or ability to attend other schools besides Roger Williams, and the judge made no fact findings on the subject. It appears Casey was willing to attend the University of Massachusetts, but was not accepted there. She was, however, accepted at Salem State College and had apparently applied to Arizona State as an Arizona resident.

[2]More specifically, in Shawn's motion seeking "[e]qual opportunity in educational decisions," Shawn sought input into college selection and college payments, an "[o]pportunity to benefit from any and all financial aid, student and parent loans and any other financial assistance programs they may qualify for," and an opportunity to claim a tax credit for payments made toward college expenses. This request was presumably in response to Paula's demand that Shawn pay his $17,000 share of the first-year expenses "in full" because "she [did] not believe he [would] pay loans as due and their child [would] graduate owing $80,000."

college expenses if she considered either of those schools. He further explained that this upset Casey so much that he stopped suggesting alternate schools. The judge, however, made no findings regarding this testimony and made few findings regarding other matters addressed in the hearing.

On the same day as the hearing, the judge vacated her September order holding Shawn in contempt and issued a new order reducing his obligation for Casey's annual college expenses from $17,000 to $7,800.[3] The judge's order was accompanied by a memorandum that did not explain how she arrived at the reduced figure.

Paula sought reconsideration. Another hearing was held on April 30, 2007, during which Shawn for the first time argued that he should only be liable for one-half the cost of a State university. He, not the judge, characterized the last order as a decision by the judge to limit his obligation to fifty percent of the cost of attending a public college.

Following the hearing, the judge affirmed her previous order limiting Shawn's obligation for Casey's college expenses to $7,800 per year. Her only explanation for this decision was that "[m]other and daughter have selected a school financially 'out of reach' for Casey's father. He has not been ordered by this court to pay fifty (50) percent of their choice of schools which was made not in compliance with the divorce agreement or pursuant to court order."

2. *Discussion.* At issue is the interpretation of college expense provisions contained in a settlement agreement, where those provisions merged with and were incorporated in the divorce judgment.[4] Although a merged provision "does not survive the judgment as a binding contract, we nevertheless will 'review the findings to determine whether the judge gave appropriate consideration to the parties' intentions as expressed in their written agreement.' " *Cooper* v. *Cooper,* 62 Mass. App. Ct. 130, 134 (2004), quoting from *Huddleston* v. *Huddleston,* 51 Mass. App.

---

[3]The judge did not find Paula in contempt.

[4]Although the judge's orders are not self-explanatory, she did not appear to be modifying the judgment by considering changed circumstances. There was no discussion of changed circumstances. Rather, she appeared to be considering and enforcing the original understanding of the parties regarding college expenses, which was reflected in the merged portions of the agreement.

Ct. 563, 568 (2001). See *Hamilton* v. *Pappalardo*, 42 Mass. App. Ct. 471, 477 (1997), quoting from *Feakes* v. *Bozyczko*, 373 Mass. 633, 635 (1977) ("to the extent that the parties['] original [merged] agreement and the judgment of divorce left their obligations in doubt, the court should 'attempt to ascertain the objective sought to be accomplished by the parties' "); *Bercume* v. *Bercume*, 428 Mass. 635, 644 (1999) ("Where an agreement does not survive, it is nevertheless appropriate for a judge to take heed of the parties' own attempts to negotiate terms mutually acceptable to them").

We begin with the relevant college expense provisions of the agreement. As previously noted, those provisions state in relevant part that "[t]he Husband and Wife shall each contribute 50% toward each child's college education expenses, including, but not limited to, room, board, tuition, books, fees and other normal educational expenses," and that both parents are to "participate fully in providing access to the child and her activities and input into educational . . . decisions affecting the child." The college expense provisions thus contemplate an interactive process regarding the selection of each child's college.[5] Both parents have the right to participate in and provide input into the selection process. Neither parent is empowered to act unilaterally regarding college selection or payment plan. At the same time, there is no provision that addresses disagreement regarding the college selection process. Compare *Hamilton* v. *Pappalardo*, *supra* at 472 (parties expressly stipulated that future disagreement would be resolved by court "at the appropriate time and in view of the law then appropriate").

The parties have differing interpretations of what they intended in the event of disagreement.[6] According to Paula, Shawn agreed to pay for one-half of Casey's expenses, regardless of the school

---

[5]See, e.g., *Johnstone* v. *Johnstone*, 226 Iowa 503, 510 (1939) (concluding that agreement requiring father to pay for child's college expenses and mother to inform father of nature and cost of instruction did not give either party exclusive right to choose school regardless of cost, but rather "indicate[d] that such matters were to be left to the future agreement of the parties").

[6]Disagreement itself is not surprising. "With the explosive growth in the cost of financing a college education, the issue of who will pay those costs after the divorce of the parents is becoming increasingly acute." 2 Kindregan & Inker, Family Law and Practice § 39:50, at 830 (3d ed. 2002). Overall, college tuition and fees have increased 439 percent from 1982 to 2007, adjusted

chosen or the cost. In support of her position, she points to the absence of language in the college expense provisions conditioning Shawn's obligation to pay on cost, his approval, or any other variable. Shawn claims that he and Paula both attended public universities and never intended the college expense provisions to require payment of private university expenses. He also suggests that his obligation to pay under the provisions is conditioned on Paula's providing him with satisfactory input into the college selection process, which he claims she did not do.

We reject both parties' interpretation of the contested provisions. We cannot conclude on this record or as matter of law that the provisions to pay for Casey's college expenses necessarily encompassed the cost of private education as argued by Paula.[7] Nor can we conclude on this record or as matter of law

for inflation. National Center for Public Policy and Higher Education, Measuring Up 2008: The National Report Card on Higher Education 8 (2008). The difference between college costs at different types of universities is also significant. According to the National Association of State Universities and Land-Grant Colleges (NASULGC), tuition and fees averaged about $3,200 for community colleges and $33,000 for private research universities in 2006-2007. NASULGC, University Tuition, Consumer Choice and College Affordability: Strategies for Addressing a Higher Education Affordability Challenge 14, 85 (2008).

[7]Courts in only four States have reached the conclusion that a provision in a settlement agreement to pay for "college expenses," without any limiting language regarding cost or choice of school, is unambiguous and requires payment of expenses for any school the child selects. See *Simpkins* v. *Simpkins*, 595 So. 2d 493, 495 (Ala. Civ. App. 1991) (rejecting father's attempt to limit his obligation to cost of public college because agreement not conditioned on his personal approval and did not include reasonableness provision); *Greenburg* v. *Greenburg*, 26 Conn. App. 591, 594, 598-599 (1992) (father required to pay for private college even though he was in a "precarious financial situation," disapproved of at least one of the children's choices, and had a longstanding preference for less expensive, State schools; "although one may sympathize with the position in which the plaintiff finds himself the fact remains that by the separation agreement he made his bed and now must lie in it" [citation omitted]); *Hartley-Selvey* v. *Hartley*, 261 Ga. 700, 701 (1991) (lower court erred in construing agreement to require father only to pay reasonable expenses and arbitrarily setting that amount at $4,500 because "where the terms of a contract are clear and unambiguous, the court must look to those terms alone to determine the intent of the parties"); *Ellis* v. *Taylor*, 316 S.C. 245, 247-248 (1994) (separation agreement requiring father "to pay all reasonable expenses for college education . . . including tuition, room and board, books, materials, and supplies" was unambiguous; "[n]othing in the agreement require[d] consideration of Father's financial ability nor [did] it require the children to minimize college expenses").

that the provision provided only for the payment of the cost of public education, as argued by Shawn.[8] Rather, the college expense provisions of the agreement reflected the parties' intentions that they each pay fifty percent of the cost of the college they had mutually selected, and in the event of disagreement on the college or the payment plan, each party would be responsible for fifty percent of the cost of reasonable college expenses. Cf. *Krapf* v. *Krapf*, 439 Mass. 97, 105 (2003), quoting from *Clark* v. *State St. Trust Co.*, 270 Mass. 140, 153 (1930) (agreement must be interpreted in accordance with "probable intention" of parties, and "common sense" and to avoid unreasonable or inequitable construction).[9]

In determining whether college expenses are reasonable, courts

[8] Courts in other States asked to rule as matter of law that an obligation to pay for "college education" is limited to the cost of a State school have uniformly rejected it. See, e.g., *Rohn* v. *Thuma*, 408 N.E.2d 578, 582 (Ind. Ct. App. 1980) (rejecting lower court's implied conclusion that, "as a matter of law, a parent's obligation to provide an undergraduate education to a child is fulfilled in every case by tendering the amount equal to the cost of a [S]tate university"); *Larsen* v. *Larsen*, 211 Pa. Super. 30, 33 (1967) ("We are reluctant to formulate a rule which would, in all cases, prevent a child from attending the college of his choice simply because it is more expensive than the [S]tate-supported university"). See also *Pylant* v. *Spivey*, 174 S.W.3d 143, 153 (Tenn. Ct. App. 2003) (restating holding in earlier case that agreement to pay for "college" not limited to public college and that "the ordinary meaning of the term 'college' include[s] private as well as public colleges").

[9] In many States, courts considering college payment provisions require college expenses to be reasonable. See *Carlton* v. *Carlton*, 670 So. 2d 1129, 1130 (Fla. Dist. Ct. App. 1996) (applying a reasonableness standard to college expense payment provision in a marital separation agreement); *In re the Marriage of Schmidt*, 292 Ill. App. 3d 229, 237 (1997) ("Although the agreement itself could have used the term 'reasonable,' . . . we find it is an implied term under contract law where a contract is silent as to price or another, more specific method of determining price"); *Rohn* v. *Thuma*, 408 N.E.2d at 583 (citing, with approval, Pennsylvania's reasonableness requirement and adopting similar balancing test for determining the extent of parent's financial responsibility under college education provision incorporated into divorce decree); *Anderson* v. *Anderson*, 522 N.W.2d 476, 480 (N.D. 1994) (to determine the extent of a father's obligation in an incorporated and merged agreement to pay for "four years of college," court must decide whether the additional expense of private school is reasonable under the circumstances); *Larsen* v. *Larsen*, 211 Pa. Super. at 34 (court must determine whether the college expenses are "reasonable under the circumstances"); *Pylant* v. *Spivey*, 174 S.W.3d at 153 (the "[Tennessee appellate] court has consistently held that [an agreement to pay for college] is subject to an implied condition of reasonableness, at least where no specific college or amount of expenses is set forth").

have appropriately considered "all relevant equitable factors." *Hamilton* v. *Pappalardo*, 42 Mass. App. Ct. at 477. These factors include "the financial resources of both parents, the standard of living the child would have enjoyed if the marriage had not been dissolved, the financial resources of the child, . . . the cost of the school, the programs offered at the school, the child's scholastic aptitude, how the school meets the child's goals, and the benefits the child will receive from attending the school." *Schmidt* v. *Schmidt*, 292 Ill. App. 3d 229, 237 (1997). See *Hamilton* v. *Pappalardo*, *supra* (factors to be considered include educational needs of child and financial circumstances of parents); *Brooks* v. *Piela*, 61 Mass. App. Ct. 731, 737 & n.8 (2004) ("[C]hildren's needs are to be defined, at least in part, by their parents' standard of living," which in some cases "includes the ability to provide certain opportunities . . . such as private school education"); Massachusetts Child Support Guidelines, principles par. 1 (2009) (encouraging "joint parental responsibility for child support in proportion to, or as a percentage of, income").

Also relevant to the inquiry is "the extent to which [a party] unjustifiably may have been excluded from the [college] decision-making process." *Hamilton* v. *Pappalardo*, *supra.* Conversely, a party who has sat on his or her right to intervene, or to seek approval from the court when the parties disagree, until the college selection process has been completed, may have waived his or her right to object to the college and its concomitant cost.

In sum, we conclude that in the absence of an agreed-upon choice of, and payment plan for, college, the parties intended to provide for a payment obligation of fifty percent of reasonable college expenses. We believe that such an interpretation "appears to be in accord with justice and common sense and the probable intention of the parties." *Krapf* v. *Krapf*, 439 Mass. at 105, quoting from *Clark* v. *State St. Trust Co.*, 270 Mass. at 153. See *Hamilton* v. *Pappalardo*, *supra.* We further conclude that in determining the reasonableness of those expenses, it is appropriate to consider the equitable factors discussed above.

In this case, we cannot discern from the judge's analysis whether she gave appropriate consideration to the parties' intentions as expressed in the college expense provisions that merged

into the judgment. See *Cooper* v. *Cooper*, 62 Mass. App. Ct. at 139 ("The judge made no findings regarding the parties' intentions, as reflected in the [merged] separation agreement"). The judge did not explain what she understood the provisions to mean or what she understood the parties' intentions to be regarding college expenses more generally. There was no legal analysis of the college expense provisions or fact finding regarding the parties' intentions. We know only that the "[m]other and daughter have selected a school 'financially out of reach' for Casey's father" and that he did not have to pay fifty percent of the cost of a college, the choice of which "was made not in compliance with the divorce agreement or pursuant to court order."

In addition, neither the judge's memoranda nor the record reflects how the judge arrived at the figure of $7,800. The only fact finding regarding the cost of a State college was Shawn's assertion that he paid $8,320 per year for his wife's son to attend Arizona State. Even if the judge decided to limit Shawn's obligation to the cost of a State college, there is no explanation as to why she ordered him to pay even less on Casey's behalf than he was paying for his wife's son to attend Arizona State.

It is also unclear why the judge determined that the choice of school was not made in compliance with the college expense provisions. Shawn took no affirmative action in court to object to Casey's choice or limit his financial obligation until after she had already begun attending Roger Williams, despite knowing she was considering that school. The first action Shawn took in court was by motion filed in October, 2006, after the judgment of contempt entered against him.[10] On the other hand, there is information in the record that Paula threatened not to support Casey if she considered the out-of-State schools proposed by

---

[10]As previously noted, Shawn did not expressly argue that he should only be responsible for one-half of the cost of attending a State school until April 30, 2007, when Casey would have been nearing the end of her freshman year. Prior to that, the main disagreement was over how he would pay his one-half of Casey's expenses at Roger Williams. Shawn wanted access to loans, or to pay Paula one-half of her loan payments as they came due, rather than being forced to pay a full one-half of the expenses on a yearly basis. In fact, at the end of the first hearing on November 3, 2006, Shawn indicated that as long as he was permitted to take out loans, it would be reasonable for him to pay for Casey's entire second year at Roger Williams since Paula had paid for her first year.

Shawn. In addition, Paula did not seek the court's approval of the choice of college before attempting to obligate Shawn to fifty percent of its cost. The judge does not expressly address this evidence, either.

It was appropriate for the judge to consider whether the cost of Roger Williams was out of reach for Shawn. However, other important equitable factors were not addressed. From this record, we have very limited information about Casey's scholastic aptitude, course of study, or any benefits of attending Roger Williams or any alternate schools, or how they might meet Casey's goals. In sum, more is required to satisfy the requirement that the judge give appropriate consideration to the parties' intentions as expressed in the college expense provisions.[11]

5. *Conclusion.* We vacate the judge's order dated November 3, 2006, and remand this case for a determination of what fifty percent of Casey's reasonable college expenses is under the circumstances.

*So ordered.*

---

[11]On a final note, Shawn has repeatedly argued that one of the reasons he cannot afford to pay for one-half of Casey's expenses at Roger Williams is his payment of his stepson's expenses at Arizona State. Although "a support provider does not 'have to deplete his total liquid or other assets in an effort to meet his support obligations,' " *Katz* v. *Katz,* 55 Mass. App. Ct. 472, 483 (2002), quoting from *Schuler* v. *Schuler,* 382 Mass. 366, 375 (1981), he enters into a second marriage conscious of his obligations to his former wife and children "so that the second marriage with its attendant obligations affords him no relief," *Katz* v. *Katz, supra,* quoting from *O'Brien* v. *O'Brien,* 325 Mass. 573, 578 (1950). While this principle generally applies in cases where a party seeks a modification, we think it applicable to the situation presented in this case as well. Shawn agreed to pay for one-half of his daughters' college educations prior to marrying his second wife and assuming payment of her son's college expenses. He has no obligation to pay these expenses. *Boucher* v. *Minter,* 349 F. Supp. 1240, 1241 (D. Mass. 1972), citing *Worcester* v. *Marchant,* 14 Pick. 510 (1834) ("Under Massachusetts law . . . a stepfather is not legally obligated to support his stepchildren"). Nor has he the right "to prefer his second family over his first." *Katz* v. *Katz, supra* at 483. His self-imposed, voluntary assumption of his stepson's expenses at Arizona State, therefore, should not factor into a determination of his available resources to pay for Casey's education or the education of his other daughter with Paula. Cf. Child Support Guidelines II-I ("Obligations to a subsequent family may be used as a defense to a request to modify an order seeking an increase in the existing order but such obligations should not be considered a reason to decrease existing orders").