NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-917

KRISTIAN PETRI TALVITIE

vs.

BARBARA TALVITIE.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Kristian P. Talvitie (husband), the former spouse of Barbara Clark (wife), appeals from a judgment entered by a judge of the Probate and Family Court on the wife's complaint for contempt.  Although the husband was not found in contempt, he was ordered to pay the wife $573,052 in alimony.  The husband claims that the judgment is based on an improper and incorrect interpretation of the terms of the parties' separation agreement.  We disagree and, accordingly, we affirm.

Background.  We summarize the relevant facts found by the judge after trial, supplementing them with undisputed facts in

---

[1] As is our custom, we set forth the parties' names as they appear in the complaint.

the record, and reserving other facts for later discussion.  See

Pierce v. Pierce, 455 Mass. 286, 288 (2009).

The parties were married in 2002.[2]  In December 2018, they filed a joint petition for divorce.  At that time, they signed a separation agreement (agreement).  The agreement provided, in relevant part, that the husband would pay a percentage of his "earned income" to the wife as alimony, according to a self-executing formula with a sliding percentage scale based on the amount of the husband's "earned income" in a given year.  In addition, income earned by the wife would result in a dollar-for-dollar reduction in the husband's earned income for purposes of calculating alimony.  The agreement defined the term "earned income" as follows.

> "gross (i.e., pre-tax) income from . . . equity based compensation (when income is actually realized or deferred on a cash basis as opposed to merely a taxable event), including gross pre-tax proceeds as a result of the release of restricted stock (but only when cash is realized from the event), the gross pre-tax proceeds from the exercise of stock options which shall be assumed to take place upon the vesting of same and following sales of resulting stock shares, and the gross pre-tax proceeds of all other forms of company ownership-based incentives from the employer, exercised qualified and non-qualified stock options and stock grants in the year income is recognized, deferred compensation (qualified or non-qualified) when said income is deferred."  (emphasis added).[3]

_____

[2] The parties had four children over the course of their marriage.

[3] The agreement's provisions pertaining to alimony merged with the divorce judgment, rather than survived with independent legal significance.

At the time of the divorce, the husband worked for a privately held company that granted him restricted stock units (RSUs) having no market value (unless a liquidity event occurred that allowed him to exchange the shares for cash). In 2019, the husband began working for a publicly traded company and forfeited the RSUs granted by his prior employer. The equity component of the husband's compensation package with his new employer included RSUs and performance-based stock units (PSUs). The husband's new employer routinely granted him bonuses in the form of stock that instantly vested: the vested RSUs and PSUs, which were released to the husband as common stock and deposited in his E*TRADE account,[4] were reported on his W-2 as taxable income. The husband's ability to sell this stock was limited by both a holdback requirement (requiring him to maintain a balance of shares equal to three times his base salary) and blackout periods during which stock could not be sold (there were approximately sixty to eighty days per year not subject to blackout periods).

In February 2022, the wife filed a complaint for contempt alleging that the husband owed her approximately $600,000 in

_____

[4] A portion was withheld and liquidated by the husband's employer to cover the taxes on the vested stock.

3

alimony based on the husband's receipt of vested RSUs and PSUs in 2019, 2020, and 2021. Following a three-day trial, the judge found the husband not in contempt because, the judge reasoned, the agreement's definition of earned income was ambiguous as applied to the husband's RSUs and PSUs granted by his new employer. As the judge explained, given the existence of a genuine dispute regarding the definition of earned income, the husband did not violate a clear and unequivocal order and, accordingly, there was no basis for a judgment of contempt. Jones v. Jones, 101 Mass. App. Ct. 673, 687 (2022). Applying basic rules of construction, the judge then found that the husband's vested RSUs and PSUs constituted earned income when their release resulted in a taxable event (as reported on the husband's W-2). The judge noted that the agreement made no mention of holdback requirements or blackout dates and concluded that such limitations placed on the husband's common stock did not affect the calculation of the husband's earned income. The judge concluded that the husband owed the wife $573,052 in unpaid alimony (the majority of which was attributable to the husband's receipt of over $6 million in vested RSUs in 2021). This appeal followed.

Discussion. The interpretation of an agreement is a question of law we review de novo. Colorio v. Marx, 72 Mass. App. Ct. 382, 386 (2008). "We review the judge's interpretation

4

of the merged agreement under traditional principles of contract law.  Although a merged provision does not survive the judgment as a binding contract, we nevertheless will review the [judge's] findings [and rulings] to determine whether the judge gave appropriate consideration to the parties' intentions as expressed in their written agreement" (quotations omitted).  Jones, 101 Mass. App. Ct. at 681, quoting Mandel v. Mandel, 74 Mass. App. Ct. 348, 351 (2009).  "Whether a separation agreement is ambiguous is [also] a question of law.  If a separation agreement 'is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one,' the language is ambiguous, and resort may be made to extrinsic evidence."  Jones, supra, quoting Bercume v. Bercume, 428 Mass. 635, 641 (1999).

Here, the husband principally contends that the judge (1) erroneously determined that the agreement was ambiguous; and (2) failed to properly consider evidence of the parties' intent when resolving the purported ambiguity.[5]  We address his arguments in turn.

_____

[5] The husband also contends that the judge erred in subtracting the wife's income from his total income, rather than from the first $330,000 of his income.  The agreement required the husband to pay alimony equivalent to 32.5 percent of his income up to $330,000, with smaller percentages assigned to three income tiers above $330,000.  The agreement provided that "the [w]ife's earned income shall reduce, dollar for dollar, the amount [of] the [h]usband's 'Earned Income' (as set forth above)

5

1. _Ambiguity_.  "Contract language is ambiguous 'where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken'" (citation omitted).  _Bank_ v. _Thermo Elemental Inc._, 451 Mass. 638, 648 (2008).  "The mere existence of the parties' disagreement does not make the language ambiguous."  _Browning-Ferris Indus., Inc._ v. _Casella Waste Mgt. of Mass., Inc._, 79 Mass. App. Ct. 300, 307 (2011).  Rather, "[a]n ambiguity arises from language susceptible of different meanings in the eyes of reasonably intelligent persons."  _Id_.  "To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties."  _Bank_, _supra_.  Accordingly, we turn first to the language of the agreement.

The alimony provision required the husband to pay the wife a percentage of his "earned income," which included "gross

---

prior to the calculation of the [h]usband's alimony amount."  We are unpersuaded, as was the judge below, by the husband's assertion that the illustrative calculation set forth in the agreement subtracting the wife's income from the husband's base salary of $330,000 demonstrated the parties' intent that the wife's income must always reduce the first $330,000 of the husband's income, even when he earns more than that.  The agreement unambiguously required the wife's income to be subtracted from the husband's total earned income (regardless of the amount), before calculating his alimony obligation using the percentages and income tiers set forth in the agreement.

6

(i.e., pre-tax) income from . . . equity based compensation (when income is actually realized or deferred on a cash basis as opposed to merely a taxable event), including gross pre-tax proceeds as a result of the release of restricted stock (but only when cash is realized from the event)" (emphasis added). The parties' dispute centers on the meaning of the phrase "cash is realized."  The husband asserts that the phrase means vested RSUs must be sold or liquidated to qualify as "earned income," whereas the wife asserts that the RSUs need only vest and be released to the husband in a form that can be easily liquidated and converted to cash to so qualify.

Neither "cash" nor "realized" are defined terms in the agreement.  Accordingly, "to ascertain possible relevant meanings" for those terms, we look to other sources, including "dictionary definitions."  Dorchester Mut. Ins. Co. v. Krusell, 485 Mass. 431, 438 (2020).  See Suffolk Constr. Co. v. Illinois Union Ins. Co., 80 Mass. App. Ct. 90, 94 (2011) ("established dictionaries can furnish the approved natural meaning of disputed terms").  Black's Law Dictionary defines "cash" as either (1) "[m]oney or its equivalent," or (2) "[c]urrency or coins, negotiable checks, and balances in bank accounts." Black's Law Dictionary (12th ed. 2024).  The second definition is self-explanatory; however, the first definition (i.e., "[m]oney or its equivalent") requires further examination.

Black's Law Dictionary sets forth several definitions for "money," including (1) "[t]he medium of exchange authorized or adopted by a government as part of its currency," and (2) "[a]ssets that can be easily converted to cash." Black's Law Dictionary (12th ed. 2024).[6] Like "cash," there is more than one accepted definition for "realized": Black's Law Dictionary defines "realization" (and the corresponding verb to "realize") as either (1) "[c]onversion of noncash assets into cash assets," or (2) "[a]n event or transaction, such as the sale or exchange of property, that substantially changes a taxpayer's economic position so that income tax may be imposed or a tax allowance granted." Black's Law Dictionary (12th ed. 2024).

As illustrated above, the phrase "cash is realized" is susceptible to more than one meaning and here each party's interpretation of that phrase is reasonable. Accordingly, the judge correctly determined that the agreement was ambiguous with respect to the RSU and PSU components of the husband's current compensation package. See Browning-Ferris Indus., Inc., 79 Mass. App. Ct. at 307. The husband nevertheless asserts that his interpretation is the only one supported by other language in the alimony provision requiring income from equity based

---

[6] The two other definitions for "money" are "[c]apital that is invested or traded as a commodity," and "[f]unds; sums of money." Black's Law Dictionary (12th ed. 2024).

8

compensation to be "actually realized . . . as opposed to merely a taxable event" (emphasis added).  He contends that this language supports his position that the parties intended for "cash is realized" to mean proceeds received from the sale or liquidation of stock, rather than stock merely reported as taxable income on a W-2.

The problem with the husband's position is that it is not supported by other surrounding language in the agreement.  See General Convention of the New Jerusalem in the U.S. of Am., Inc. v. MacKenzie, 449 Mass. 832, 835 (2007) ("The words of a contract must be considered in the context of the entire contract rather than in isolation").  The alimony provision lists several types of "equity based compensation" that qualify as "earned income," including RSUs and stock options.  With respect to the latter, the agreement provides that "the gross pre-tax proceeds from the exercise of stock options" constitute earned income "upon the vesting of same and following sales of resulting stock shares" (emphasis added).  Although the parties specifically included language requiring the sale of exercised stock options, they did not include similar language requiring the sale of vested RSUs (instead they included language requiring that "cash is realized").  Had the parties intended for vested RSUs to qualify as "earned income" only if they are liquidated or sold, they could have included language to that

9

effect, but they did not.  Cf. Computer Sys. of Am., Inc. v. Western Reserve Life Assur. Co. of Ohio, 19 Mass. App. Ct. 430, 437 (1985) ("if the parties had intended at-will termination, they could have said so . . . expressly" in lease agreement). Moreover, requiring that vested RSUs be sold before treating them as earned income would complicate the calculation of the husband's income, in contravention of the parties' stated intent for the agreement's alimony provision to be self-executing, enabling them to calculate the husband's alimony obligation without "the necessity of ongoing litigation."

2.  Evidence of intent.  "[W]here the separation agreement is ambiguous, the governing consideration is the intent of the parties to the separation agreement as determined by objective evidence."  Jones, 101 Mass. App. Ct. at 683.  "Once a contractual ambiguity emerges, the meaning of the uncertain provision becomes a question of fact for the trier."  Browning-Ferris Indus., Inc., 79 Mass. App. Ct. at 307.  "The fact finder may then consult extrinsic evidence including the circumstances of the formation of the agreement and the intentions and objectives of the parties."  Id.  The husband asserts that the judge failed to consider extrinsic evidence of the parties' intent, instead impermissibly relying on the opinion of the wife's expert.  For the reasons that follow, we are not persuaded.

10

To begin with, both parties employed experts to complete alimony calculations for the years in question. Those calculations were based on the party's interpretation of "earned income" under the agreement. The judge found that the wife's expert appropriately relied on the Black's Law Dictionary definition of "realized" by including in his calculation of the husband's "earned income" the vested RSUs reported as taxable income on his W-2 for each year. The judge did not abuse his discretion in accepting this testimony. See Jones, 101 Mass. App. Ct. at 683.

Next, contrary to the husband's assertion, the judge did not "fail[] to make any findings regarding the parties' intent behind the purported ambiguities in the agreement." Rather, the judge's findings demonstrate that he considered extrinsic evidence consisting of the circumstances surrounding the negotiation of the agreement and the husband's conduct following its execution in determining the intent of the parties. The judge found that the agreement was drafted at a time when the husband worked for a privately held company and his compensation package included RSUs that "had no inherent value as a liquidity event was required prior to [the] [h]usband having the opportunity to realize income from the grant of stock." The judge found that "[u]nder those circumstances, it was reasonable to include a limiting provision in the [a]greement that limited

11

[the] [h]usband's obligation to pay alimony on RSUs to 'gross pre-tax proceeds as a result of the release of restricted stock (but only when cash is realized from the event),'" but that "[r]eading the [a]greement as a whole, particularly in this context, . . . the parties did not intend this limitation to apply to [the] [h]usband's receipt of RSUs from a publicly held company."  The judge concluded that "[t]o do so would be contrary to the provisions of the [a]greement that require payments to be made 'in a timely manner and in good faith'" and ensuring that the wife will "be able to rely upon a certain level of support to meet her needs."  The judge also appropriately considered, consistent with G. L. c. 208, and the case law interpreting that statute, that "the purpose of an alimony obligation is for the payor spouse to provide support to the recipient in order to enable [the recipient] to maintain the marital lifestyle," which "purpose is thwarted if [the] [h]usband is able to withhold payment on RSUs and PSUs for an indefinite period."[7]  See Jones, 101 Mass. App. Ct. at 683 (judge interpreting merged agreement pertaining to alimony must consider parties' intentions and decide case "in the context of the governing statute, G. L. c. 208").

---

[7] The judge found that the wife's ability to maintain the marital lifestyle was impaired by the husband's refusal to treat his vested RSUs as part of his earned income in 2021.

12

In addition to considering the circumstances described above, the judge also considered the husband's performance of his obligations under the agreement after it was signed.  See Brigade Leveraged Capital Structures Fund Ltd. v. PIMCO Income Strategy Fund, 466 Mass. 368, 378 (2013) ("in interpreting [a] contract, [the] conduct of the parties after the signing of the agreements is . . . indicative of their intent," as "[t]here is no surer way to find out what parties meant, than to see what they have done" [quotations and citations omitted]).  The judge found that the husband calculated his alimony obligation for 2019 and 2020 using the "entirety of [his] W-2 income," which included vested RSUs reported as taxable income on his W-2 for each of those years.  The husband testified that he treated the vested RSUs reported on his W-2 as part of his earned income when calculating his alimony obligation for 2019 and 2020, despite that he was unable to immediately sell that stock because of the holdback requirement.[8]  The judge found that the husband changed his position in 2021, by excluding from his income the vested RSUs reported on his 2021 W-2 and instead calculating his alimony obligation using only his base salary

_____

    [8] The husband testified that, notwithstanding the holdback requirement, he was able to pay his alimony obligation for both years by taking out a mortgage in 2020, and by selling stock in 2021 "that had vested in the previous year."

13

for that year.[9]  This change coincided with the receipt of over $6 million in vested RSUs in 2021 (which were reported as taxable income on his W-2 for that year).

The judge ultimately concluded that treating vested RSUs as "earned income" once they are reported on the husband's W-2 was consistent with the parties' intentions as expressed in their agreement, and that the holdback requirement did not affect the calculation of the husband's alimony obligation.  As we have discussed, in reaching this conclusion the judge considered (1) the agreement as a whole, (2) extrinsic evidence of the parties' intent (including the circumstances at the time of drafting the agreement and the husband's subsequent performance of his obligations), and (3) the purpose of alimony as set forth in G. L. c. 208, and case law interpreting that statute.  We discern no error in the judge's analysis or in his

---

[9] The husband testified that shortly before those RSUs vested, he filed a complaint for modification seeking to reduce his alimony obligation.

ultimate construction of the agreement.[10]  Accordingly, we affirm the judgment.

So ordered.

By the Court (Vuono, Rubin & Walsh, JJ.[11]),

*Paul Little*

Clerk

Entered:  October 16, 2024.

---

[10] The husband contends that the judge erred in failing to construe any ambiguities in the agreement against the wife, because her attorney drafted the agreement.  The judge rejected this argument because although the husband was pro se during the divorce proceedings, he had a level of financial sophistication that "allowed him a greater understanding of the [a]greement than [the] [w]ife" and that "giving effect to [the] [h]usband's position would result in an unreasonable meaning."  We discern no error with respect to the judge's reasoning in this regard.

[11] The panelists are listed in order of seniority.