300                    79 Mass. App. Ct. 300 (2011)

Browning-Ferris Industries, Inc. *v.* Casella Waste Management of Massachusetts, Inc.

BROWNING-FERRIS INDUSTRIES, INC. *vs.* CASELLA WASTE
MANAGEMENT OF MASSACHUSETTS, INC.

No. 09-P-156.

Suffolk. December 8, 2009. - April 19, 2011.

Present: BERRY, BROWN, & SIKORA, JJ.

*Solid Waste Management. Contract,* Construction of contract, Mistake,
Rescission. *Mistake. Practice, Civil,* Attorney's fees.

Discussion of the standard of review for determining whether a contract
  contains an ambiguity. [307-308]
In a civil action arising from a contractual dispute, the judge did not err in
  supplying a term, where an ambiguity existed in the contract [308], an
  examination of extrinsic evidence did not permit a decisive outcome for
  either party [308-310], the evidence amply supported the judge's finding
  of an omission [310-311], and the term inserted served the main purposes
  of both parties and preserved the agreement as a rational business agree-
  ment [311-313]; further, the judge did not err in denying the remedy of
  rescission, where the harm to the party seeking rescission was not so
  fundamental to the contract as to upset the very basis for it [313-314].
In a civil action arising from a contractual dispute, the judge properly denied
  a request for attorney's fees pursuant to a provision of the contract, where
  neither party was a "prevailing party" within the meaning of the contract.
  [314-315]

CIVIL ACTION commenced in the Superior Court Department on
December 13, 2004.

The case was heard by *Ralph D. Gants*, J.

*Robert S. Sanoff* for the plaintiff.

*Edward C. Cooley* for the defendant.

SIKORA, J. This appeal presents an issue of contract
interpretation. What standards permit a court to furnish a term
missing from an agreement by reason of the parties' mutual
mistake or negotiating oversight? The two contracting parties,
Browning-Ferris Industries, Inc. (BFI), and Casella Waste
Management of Massachusetts, Inc. (Casella), engage in the

79 Mass. App. Ct. 300 (2011)                                    301

Browning-Ferris Industries, Inc. *v.* Casella Waste Management of Massachusetts, Inc.

collection, transport, and disposal of solid waste material. Waste management companies of their large scale own, or contract for the use of, three major assets: (1) hauling routes typically acquired by agreement with municipalities or private entities from which the company collects residential and commercial waste; (2) transfer stations, located at short or intermediate distances from the hauling routes, to which the company brings collected material for sorting, processing, and temporary storage; and (3) disposal sites, usually more distant landfills or incinerators, to which the company brings the material for deposit or elimination. In a waste-to-energy disposal facility, the heat from incineration will generate steam convertible to electricity.

In this instance, BFI and Casella shared disposal rights at an incinerator facility. A dispute arose over their entitlements under a specific provision of their governing "Disposal Rights Agreement" (DRA). BFI sued for a declaratory judgment defining the provision. Casella counterclaimed for a contrary declaratory judgment or, alternatively, rescission of the DRA. At the conclusion of a four-day bench trial, a judge of the Superior Court found and ruled that the contested provision contained a significant ambiguity about which the firms had never reached a meeting of the minds. In an effort to fill the gap of their omitted understanding and to preserve the contract, he inserted a term designed to implement the stated business objectives of the parties, declared the resulting agreement binding, and dismissed the counterclaim for rescission. Each side has appealed from the resulting judgment: BFI challenges the inserted term; Casella objects to the denial of rescission. For the following reasons, we affirm the judgment.

*Factual background.* The following facts emerge from the jury-waived trial as undisputed or as amply supported by the evidence. We reserve certain details for discussion of the parties' arguments.

1. *The Ogden master agreement.* In 1986, BFI entered into a long-term disposal master agreement with Haverhill Power, Inc., a utility company planning to develop and own a waste-to-energy incinerator facility in Haverhill. The master agreement extended to December 31, 2014. In or about 1999, Haverhill Power, Inc., assigned its rights under the master agreement, with BFI's consent, to Ogden Haverhill Associates (Ogden).

The terms of the master agreement required BFI to supply the Ogden facility with 250,000 to 275,000 tons of waste per year. BFI's daily and monthly commitments varied by the month between specified minimum and maximum amounts. BFI paid a per ton fee (the "tipping fee") for disposal service; the fee increased each year by the greater of three percent or the rise in the consumer price index for the greater Boston area. The agreement contained a "put or pay" term; i.e., it subjected BFI to financial penalties if the company failed to deliver at least eighty percent of its required monthly minimum tonnage to the Ogden facility.

2. *Antitrust developments.* In 1999, Allied Waste Industries, Inc. (Allied), the third largest waste management company in the United States, entered an agreement to acquire BFI, the second largest waste management company in the nation. The antitrust division of the United States Department of Justice (DOJ) concluded that the proposed merger would substantially lessen competition in as many as fourteen distinct markets throughout the country, including the eastern Massachusetts region, so as to violate Section 7 of the Clayton Act.[1] It threatened to sue to enjoin the merger and began negotiations with the two companies.

The terms of the resulting consent judgment permitted the merger upon condition of divestiture of substantial designated assets (hauling routes, transfer stations, and disposal facility rights) by BFI and Allied in the affected markets throughout the country. Within the eastern Massachusetts market, the consent judgment compelled BFI to divest (1) any commercial routes recently acquired by it and serving Essex, Middlesex, Suffolk, Norfolk, Bristol, or Worcester Counties (i.e., its Peabody-based hauling operation including trucks, garages, equipment, supplies, permits, contracts, and accounts); (2) transfer stations in Auburn, Holliston, and Braintree; and (3) disposal or ownership

---

[1]DOJ's court papers recited that BFI was engaged in collection and disposal services "throughout the country" and had accrued operating revenues of over $4.7 billion in its fiscal 1998 year. They described Allied as engaged in more than twenty States with total operating revenues of more than $1.6 billion in fiscal 1998.

DOJ defined the relevant eastern Massachusetts market to consist of Essex, Middlesex, Suffolk, Norfolk, Bristol, and Worcester Counties.

rights in its waste-to-energy incinerator in Rochester; airspace disposal rights at its Fall River landfill; and airspace disposal capacity of as much as 1,150 tons of waste per day at the Ogden incinerator for a period of ten years.

BFI was obliged to sell those assets to viable independent competitors. In addition, "none of the terms of any agreement between the purchaser and [BFI] [may give BFI] the ability unreasonably to raise the purchaser's costs, lower the purchaser's efficiency, or otherwise interfere in the ability of the purchaser to compete effectively in each relevant area." The consent judgment directed BFI to use its best efforts to accomplish the divestitures within 120 days.

3. *Negotiations between BFI and Casella.* For Casella, the divestiture orders created a significant opportunity. As of 1999, it was a regional waste collection firm centered in Vermont, New Hampshire, and Maine, but ambitious to expand its small presence in Massachusetts. It responded to BFI's overture to purchase its detachable assets. Negotiations proceeded for approximately four months, from early October of 1999 to the beginning of February, 2000; they covered multiple contracts for divestitures mandated by the consent judgment. Each side assigned one executive and one drafting attorney to the process. For the merging entity of BFI and Allied,[2] Richard Wojahn, assistant to the Allied president, served as negotiator, and Attorney Kenneth Lee of the Phoenix, Arizona, law firm of Fennemore Craig, P.C., as drafter. For Casella, chief operating officer James Bohlig and Attorney Jeffrey Stein of the Boston law firm of Hale and Dorr, LLP, performed those roles. Their negotiations addressed as many as seven contracts, including the agreements necessary for the transfer of BFI's hauling operations based in Peabody and covering routes within a fifty-mile radius; the conveyance of its Auburn and Holliston transfer stations; and the sale of up to 1,150 tons per day of disposal capacity at the Ogden facility.

Wojahn and Bohlig had one face-to-face meeting and numerous telephone discussions. They informed each other of their respective business objectives but did not become involved in

[2]Under the acquisition and merger, BFI became a wholly owned subsidiary of Allied. For continuity we will continue to designate the resulting entity as BFI.

the specific drafting of contractual terms. As to the sale of capacity at the Ogden incinerator, Bohlig pursued three objectives or "deal points": a favorable price; adequate disposal capacity for growth of its collection volume; and protection against put or pay penalties if that growth declined or fluctuated. Wojahn sought two objectives for BFI: a reasonable price, and predictable volumes of delivery from Casella. BFI wanted to prevent declining or fluctuating deliveries from Casella because BFI would remain liable to Ogden under the original master agreement for any shortfalls and would have to fill them with its own deliveries or risk put or pay assessments. Even if it did not incur those penalties, it would have to divert volume to the Ogden facility which would otherwise go to alternate disposal landfill sites in South Carolina. It reached those sites by railway transport secured by long-term leases. That system of alternative shipment to South Carolina provided BFI with a disposal saving of five to fifteen dollars per ton against the more expensive rates of the Ogden incinerator.

The attorneys worked through three drafts toward the final Ogden DRA. The contract would run with the master agreement to the end of 2014. Section 4, entitled "Delivery Rights and Obligations," addressed BFI and Casella's respective concerns in the following pertinent language:

> "[§ 4](a) *Percentage.* Monday through Friday, Casella shall deliver . . . solid waste to the [Ogden] Facility in an amount . . . as will yield 380 tons per day (Monday through Friday) and [fifty] tons on Saturday (the 'Percentage Daily Maximum'). . . .

> ". . .

> "(d) *Monthly Adjustments.* Casella shall have the *right to increase, but not to decrease,* the Percentage Daily Maximum once per calendar month. To exercise the right, Casella shall provide written notice to BFI which notice shall be received by BFI at least [ten] days *prior to the beginning of the calendar month for which Casella desires the increase to be effective.* Such notice shall also contain an estimate of the amount of waste *that will be delivered daily to the Facility from Casella during the following*

*month*. In no event shall the month to month increase be more than [ten percent] over the previous month. Notwithstanding the above, at no time shall the amount of waste delivered by Casella for any day, month or year exceed the applicable daily, monthly or yearly maximums set forth on [an attached schedule]."

(Emphasis supplied.) Along with three other divestiture agreements, the parties executed the Ogden DRA on February 4, 2000.

4. *Performance of the DRA, 2000-2004*. For each of the months of March, April, May, and June, 2000, Casella exercised its right under § 4(d) to increase its delivery tonnage. On March 2, it gave notice of a ten percent increase for that month over and above the weekday baseline amount of 380 tons and the Saturday level of fifty tons to amounts of 418 tons and fifty-five tons, respectively. On April 3, and for the month of April, it gave notice of a further ten percent increase above the March levels to bring the weekday figure to 460 tons and the Saturday number to sixty-one tons. On April 28, and for the month of May, it gave notice of another ten percent increase above April levels for resulting weekday and Saturday figures of 506 and sixty-seven tons, respectively. And on June 7 and for the month of June, it notified BFI of another weekday increase of ten percent over the volume of the previous month to bring that amount to 557 tons. None of the notices complied with the ten-day advance period or included the estimate of the next month's daily volume required by § 4(d). Rather, the notices took the form of conversations and electronic mail communications between managerial personnel of the companies.[3]

The two firms maintained those Ogden disposal levels until approximately August of 2004. Since the negotiation of the DRA in late 1999, Casella had regarded the Ogden disposal rates and their annual consumer price index or three percent increases as above market and had sought less costly alternatives

---

[3]The need for greater capacity resulted from Casella's acquisition in 1998 of a smaller waste hauling company in New Hampshire and its contribution to volume.

for uncommitted volume.[4] In 2003, Casella had completed construction of its own sanitary landfill in Hardwick, and in 2004 construction of another in Southbridge. Those sites provided less expensive disposal, and vertically integrated or "internalized" part of Casella's operations from collection through disposition of solid waste.

In August of 2004, Casella curtailed deliveries to Ogden and in September notified BFI of its position that under § 4(d) of the DRA it had no obligation to maintain a monthly minimum volume. BFI responded that § 4(d)'s language allowing Casella to "increase, but not to decrease" its monthly volume prohibited any decrease from the existing cumulative levels of 557 tons and sixty-seven tons. When correspondence between officers and counsel for each side did not solve the dispute, BFI brought suit for declaratory relief. Casella counterclaimed for declaratory relief and alternatively for rescission nullifying the DRA or reformation allowing it to return to the baseline monthly volumes.

5. *The Superior Court judgment.* After an analysis of the evidence, the judge concluded that the parties had never reached an understanding of the language of § 4(d). He ordered the addition of the following term to that section and declared the resulting contract valid and binding upon the parties.

> "If Casella increases the 380 tons per weekday and [fifty] tons per Saturday daily maximum tonnage, whether once or multiple times, Casella may decrease that daily maximum tonnage in increments of no more than [ten] percent, once or multiple times, after giving advance written notice to BFI at least three months before the month the reduction is to become effective, provided that the decreases do not reduce the daily maximum tonnage below 380 tons per weekday and [fifty] tons per Saturday."

In effect, this supplemental language allowed Casella to move downward from the enhanced levels to the baseline obligations by subtractions of up to ten percent per month upon three months' notice of each intended subtraction.

---

[4] Bohlig believed the Ogden tipping rate to be fifteen to twenty dollars more per ton than BFI's South Carolina landfill rates; he believed also that BFI was denying Casella access to that railway route alternative so as to hamper competition.

*Analysis.* BFI insists that the monthly adjustment language of § 4(d) shows sufficiently clearly that any increase of delivery by Casella would be irreversible; that no ambiguity or omission permitted the judge to insert additional terms; and that BFI deserves the entry of a judgment declaring the permanence of Casella's heightened amounts. Conversely, Casella argues that the companies' misunderstanding of the monthly delivery term was so fundamental that it requires rescission of the entire agreement. As a secondary solution, it would accept the judge's insertion of the supplemental term. We will address those positions in turn.

1. *Standard of review.* First we must decide whether § 4(d) contains an ambiguity. That determination presents a question of law for the trial court and one for de novo review by the appellate court. *Bank* v. *Thermo Elemental Inc.*, 451 Mass. 638, 648 (2008). See, e.g., *Berkowitz* v. *President & Fellows of Harvard College*, 58 Mass. App. Ct. 262, 270 (2003); *Quinn* v. *Mar-Lees Seafood, LLC*, 69 Mass. App. Ct. 688, 695 (2007). An ambiguity arises from language susceptible of different meanings in the eyes of reasonably intelligent persons. See *Citation Ins. Co.* v. *Gomez*, 426 Mass. 379, 381 (1998), and cases cited; *Quinn* v. *Mar-Lees Seafood, LLC*, *supra* at 695. The inspection for ambiguity focuses first upon the contested language "by itself." *Bank* v. *Thermo Elemental Inc.*, *supra* at 648. The mere existence of the parties' disagreement does not make the language ambiguous. See *Jefferson Ins. Co.* v. *Holyoke*, 23 Mass. App. Ct. 472, 475 (1987); *Colorio* v. *Marx*, 72 Mass. App. Ct. 382, 388 (2008).

Once a contractual ambiguity emerges, the meaning of the uncertain provision becomes a question of fact for the trier. *Seaco Ins. Co.* v. *Barbosa*, 435 Mass. 772, 779 (2002). The fact finder may then consult extrinsic evidence including the circumstances of the formation of the agreement and the intentions and objectives of the parties. See, e.g., *Haverhill* v. *George Brox, Inc.*, 47 Mass. App. Ct. 717, 720 (1999). That investigation can extend to related documents and transactions comprising a "general scheme" of which the contested contract is a part. See *Glick* v. *Greenleaf*, 383 Mass. 290, 296 (1981). Any findings by the trial judge, especially upon matters of credibility, will

receive usual deferential review under the "clearly erroneous" standard of Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996). In this case the judge followed these guidelines. They led him to the conclusion that ambiguous language masked the omission of a term overlooked by both parties.

2. *Declaratory interpretation.* a. *Existence of an ambiguity.* In its textual analysis of § 4(d), BFI emphasizes the phrase that "Casella shall have the right to increase, but not to decrease, the Percentage Daily Maximum once per calender month." It reasons that if, as the parties acknowledge, the "Percentage Daily Maximum" serves as a synonym for the tonnage figures of 380 and fifty, then the cited language permits only an upward change of that figure. It points out the absence of any process (such as notice and estimate) for decrease of delivery. Finally, it emphasizes the upward looking character of the final two sentences of § 4(d) — limiting monthly increases to compounded increments of ten percent, and capping the ultimate daily, monthly, and yearly maxima under an attached schedule — as indication that only contemplated concern would be one-way escalation and possible excessive deliveries.

Several other phrases of § 4(d) support Casella's contrary view of increases as temporary arrangements with a right of reversion to the baseline tonnage at the end of each month. The second sentence requires Casella to provide written notice to BFI ten days "prior to the beginning of *the calendar month for which Casella desires the increase to be effective*" (emphasis supplied). The third sentence requires the notice to contain an estimate of the amount of daily deliveries from Casella *"during the following month"* (emphasis supplied). Casella views any language for reversion to a prior level of delivery as unnecessary; the reversion would occur automatically at the end of the designated month.

The text leaves enough room for reasonable disagreement. The judge correctly detected ambiguity and moved forward to attempt to resolve it by examination of extrinsic evidence.

b. *Extrinsic evidence.* Circumstances outside the text present conflicting indicators. Several lend support to BFI's position. Two of the other divestiture contracts between the parties executed simultaneously with the DRA (one providing mutual access to existing transfer stations and the other to a subsequent

station to be built by Casella in Peabody) authorized monthly sharing of capacity upon proper notice but included explicit statements of reversion to prior volumes at the close of the designated month. BFI views the absence of a similar clause in § 4(d) as the denial of a right of reversion to Casella. The antitrust consent judgment prohibited BFI from "reacquiring any interest in any [r]elevant [d]isposal assets or [r]elevant [h]auling [a]ssets divested . . . without . . . written consent of, the United States." Capacity rights at the Ogden facility fell nominally within the definition of such relevant disposal assets. BFI characterizes a reversion of space to it as a forbidden reacquisition. In addition, it stresses the inference available from the parties' four-year course of dealing from early 2000 to mid-2004. "There is no surer way to find out what parties meant, than to see what they have done." *Martino* v. *First Natl. Bank*, 361 Mass. 325, 332 (1972), quoting from *Insurance Co.* v. *Dutcher*, 95 U.S. 269, 273 (1877). *Novel Iron Works, Inc.* v. *Wexler Constr. Co.*, 26 Mass. App. Ct. 401, 409 (1988), and cases cited. After its initial four monthly increases in March through June, 2000, Casella never proposed a decrease of tonnage until August, 2004.

Finally, BFI invokes, as its intention and main business objective at the time of formation, the achievement of a predictable flow of volume to the Ogden plant upon which it could plan its long-term railway leases for shipment to South Carolina of the tonnage shut out of Ogden by Casella deliveries. Alternating increases and decreases at Ogden would disrupt that predictability.

Other circumstances assist Casella. The consent judgment's prohibition of any divestiture contract term enabling BFI unreasonably to raise a purchaser's costs, lower its efficiency, or interfere with its capacity for effective competition weighs generally against the imposition of exclusively upward monthly adjustments at the expensive Ogden facility. Further, Attorney Lee in behalf of BFI was the original drafter of the "right to increase, but not to decrease" phrase of § 4(d). Generally a court will construe ambiguous contractual language against its author. *Merrimack Valley Natl. Bank* v. *Baird*, 372 Mass. 721, 724 (1977). That canon may operate with less force if, as here,

the language has emerged from negotiation between capable opposing drafters. See *RCI Northeast Servs. Div.* v. *Boston Edison Co.*, 822 F.2d 199, 203 n.3 (1st Cir. 1987) ("both of these worldly-wise litigants must share the responsibility for the clause's upbringing").

Most importantly, Casella's intention and business objective at the time of formation was cautious expansion in the eastern Massachusetts market. It needed disposal capacity at the Ogden plant for such growth (from the acquisition of new hauling routes, seasonal developments, or so-called "volume events" such as bad weather or natural disasters causing uneven collection periods) without commitment to high levels of disposal and their accompanying risk of shortfalls with put or pay penalties. A two-directional system of monthly adjustments would provide it with the desired flexibility.[5]

In sum, no decisive outcome results for either party from the extrinsic evidence. The judge proceeded to investigate whether the language of § 4(d) reflected not the ambiguous statement of one party's version, but rather the omission of a term on the part of both parties.

c. *Omission.* The testimony of Attorney Lee and negotiator Wojahn in behalf of BFI, and of negotiator Bohlig in behalf of Casella, is telling.[6] At the outset, one must remember that the executives and the lawyers were creating multiple contracts under the pressure of time lines set by the consent judgment.

Attorney Lee testified that Wojahn gave him general direction for drafting upon the subjects of "key economic terms, price, . . . seller, [and] assets being sold." He did not receive specific instruction upon the subject of monthly volume adjustments at the Ogden facility. Nor did he discuss with opposing counsel the specific flexibility of the baseline figures.

Wojahn recalled each company's general objectives: BFI's

---

[5]As the judge pointed out, Casella was unlikely to have assumed short-run monthly obligation increases of ten percent if it understood them to be irreversible throughout the remainder of the DRA. That covenant would convert the short-run need of a one-month adjustment to a long-term commitment through the end of 2014.

[6]Wojahn testified by deposition. Bohlig and Attorney Lee testified at trial. Attorney Stein (Casella's drafter) did not testify. At the conclusion of their direct and cross-examination, the judge questioned Lee and Bohlig extensively.

aversion to fluctuating monthly deliveries to Ogden and desire for predictable volumes for the railway cars to South Carolina, and Casella's aversion to shortfalls and put or pay assessments at Ogden. He viewed the contested language as making Casella's monthly increases permanent. However, he did not testify that he communicated that specific position to Bohlig or to Attorney Lee.

Bohlig testified, consistently with Wojahn, that they had informed each other of their respective business objectives, but that they had never discussed the particular subject of monthly delivery adjustments at Ogden. Bohlig did not testify to any specific instructions to Attorney Stein upon the subject. He reported that he had not participated in the detailed drafting process.[7] Bohlig understood the contested language to mean that Casella could increase or decrease its monthly tonnage to Ogden above the baseline daily requirements of 380 tons and fifty tons, but that it could not decrease its deliveries to any level below the baseline.

In short, the executives did not discuss with each other the flexibility of the monthly disposal rights. Nor did they give drafting directions to their attorneys upon that subject. Nor did the attorneys in their exchange of drafts explicitly address the reversibility of an increase of capacity taken by Casella. The evidence amply supports the judge's finding that BFI and Casella never achieved a specific understanding, or meeting of the minds, upon the critical question whether § 4(d) of the DRA permitted Casella to revert to the baseline level of 380 tons and fifty tons after the months for which it sought an increase of capacity. He correctly detected a gap in the agreement.

d. *Equitable insertion of the omitted term.* The judge's injec-

---

[7] If Attorney Stein informed him of a drafting issue, Bohlig would pursue a solution with Wojahn. The Ogden monthly adjustment topic did not appear to fall within that process.

Under adverse direct examination, Bohlig answered as follows:

> *Q.*: "And in Mr. Stein's draft to the Disposal Rights Agreement . . . he raised Mr. Lee's proposal [from] a ten percent increase per quarter to 25 percent per month; isn't that true?"
>
> *A.*: "I don't know. I was never party to the drafts."
>
> *Q.*: "You didn't have any role in the drafting?"
>
> *A.*: "No. And I certainly didn't follow the drafts."

tion of a curative term was appropriate. "Where the parties to a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances will be supplied by the court." *Fay, Spofford & Thorndike, Inc.* v. *Massachusetts Port Authy.*, 7 Mass. App. Ct. 336, 342 (1979). See *President & Fellows of Harvard College* v. *PECO Energy Co.*, 57 Mass. App. Ct. 888, 896 (2003), quoting from Restatement (Second) of Contracts § 204 comment d (1979) (in circumstances of "a question that the parties simply never considered, [the court may consider evidence of the parties' relationship and] 'supply a term which comports with community standards of fairness and policy' ").

The equitable insertion here treats the parties even-handedly and serves the professed business objectives of both. The added term (1) permits Casella to decrease its monthly delivery obligation by increments of no more than ten percent, (2) multiple times, (3) upon written notice of at least three months before the beginning of the affected month, (4) provided that the decreases do not reduce its delivery obligation below the baseline level of 380 tons per weekday and fifty tons on Saturday. The remainder of § 4(d) will remain intact. The starting point for the new process would be the levels in place at the beginning of the dispute, 557 tons on weekdays and sixty-seven tons on Saturday.

The term furnishes to Casella capacity for growth and protection against irrevocable commitments and their risk of put or pay penalties. It provides BFI with a three-month notice period to cushion ten percent increments and decrements by adjustment of its railway disposals to South Carolina.[8] It serves also the community standard embodied in the consent judgment's

---

[8]In the course of his findings and conclusions of law, the judge doubted whether any fluctuations in Casella's monthly delivery to the Ogden facility disrupted BFI's leases or capacity for railway shipments to South Carolina. The evidence justified his skepticism. BFI's New England district manager acknowledged that the railway leases had terms of seven to ten years and contained a fluctuation tolerance of 5,000 tons per month. He could not specify any particular incident connecting changes in the volume of Casella's Ogden deliveries to changes in the volume of BFI's railway shipments. He conceded that shipment to South Carolina instead of delivery to Ogden saved BFI four to five dollars per ton, and that replacement of Casella's full reduction at Ogden (the tonnage above baseline) could cost BFI approximately

prohibition of any contractual terms interfering with the competitive ability of a purchaser of divested assets.

The insertion also implements convergent lines of Massachusetts contract doctrine. If it is reasonably possible and equitable, the court will resolve indefinite language to salvage a workable agreement. Interpretation should favor a "valid and enforceable" relationship rather than a failed and ineffectual effort. See *Lafayette Place Assocs.* v. *Boston Redev. Authy.*, 427 Mass. 509, 517 (1998), cert. denied, 525 U.S. 1177 (1999), and cases cited. In particular, the court's construction of the contract will attempt to fulfil the visible "intention[s] of the parties" and to provide them with a "rational business instrument." See, e.g., *Starr* v. *Fordham*, 420 Mass. 178, 192 (1995); *Finn* v. *Mc-Neil*, 23 Mass. App. Ct. 367, 372 (1987); *Winchester Gables, Inc.* v. *Host Marriott Corp.*, 70 Mass. App. Ct. 585, 595 (2007). The new term serves both purposes.

3. *Rescission.* Casella contends, in essence, that the omission of a term upon the subject of monthly adjustments amounts to a mutual mistake warranting the remedy of rescission. That remedy would release it entirely from the remainder of its commitment through 2014 to BFI at the Ogden plant. In Massachusetts, rescission requires proof by clear and convincing evidence of a mutual mistake upon an essential element of the agreement. See *Bucciero* v. *Drinkwater*, 13 Mass. App. Ct. 551, 555 (1982); *Samuels* v. *Brooks*, 25 Mass. App. Ct. 421, 428 (1988); *Shawmut-Canton LLC* v. *Great Spring Waters of Am., Inc.*, 62 Mass. App. Ct. 330, 338 (2004). Its equitable character places it in the sound discretion of the court amid the total circumstances of the dispute. See *Lima* v. *Lima*, 30 Mass. App. Ct. 479, 484 (1991); *Worcester Heritage Soc., Inc.* v. *Trussell*, 31 Mass. App. Ct. 343, 346 (1991).

The harm to the party seeking rescission must be fundamental to the contract so as to "take[] away its foundation." *De Angelis* v. *Palladino*, 318 Mass. 251, 257 (1945). See *Worcester Heritage Soc., Inc.* v. *Trussell, supra* at 345-346. "Relief [by rescission] is only appropriate in situations where a mistake of both parties has such a material effect on the agreed exchange

---

$2,000 per day. BFI's concern appeared to be the expense at Ogden rather than the reliability of rail capacity for shipment to South Carolina.

of performance as to upset the very basis for the contract." Restatement (Second) of Contracts § 152 comment a, at 386 (1979).[9]

Casella's claim does not approach that magnitude. The parties worked satisfactorily under the agreement for more than four years. Casella's complaint is not that it has not and cannot receive its intended main benefits under the missing term, but rather that it cannot achieve the desirable full savings of alternate disposal at its newly constructed landfills. The judge's remedy furnishes it the benefit of partial savings. The monthly adjustment provision is a substantial, but nonetheless ancillary, term of the agreement.

Finally, the equitable insertion places the parties well inside the perimeter of the performance quantities deemed acceptable by the original language of their agreement. The baseline delivery level has always been the clear, fundamental, and uninterrupted term of the agreement. Under the original language, the parties accepted the prospect of a fourteen-year period of daily delivery amounts of 380 tons and fifty tons. They accepted also the possibility of daily delivery amounts above the baseline. No disruption of an essential expectation has occurred. The judge correctly denied the remedy of rescission.[10]

4. *Attorney's fees.* Section 17 of the DRA provides that "[i]n the event of any litigation arising out of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees." Casella sought an award. The judge denied the request upon the ground that neither party was a "prevailing party" within the meaning of the contract. As either a ruling of law (interpretation of an unambiguous contractual term) or as a finding of fact (a determination of prevalence not clearly erroneous), that determination is not erroneous.

[9]The parties' mutual mistake of fact or law "must be so substantial and fundamental as to defeat the object of the parties. A mutual mistake of material fact as to a basic assumption may result in rescission when the mistake upsets the very basis of the contract . . . ." 27 Williston, Contracts § 70:34, at 316 (4th ed. 2003). "The sine qua non test is applied in cases of mutual mistake, that is, whether the contract would have been entered into had there been no mistake." *Id.* at 314.

[10]As a matter of equitable balance, rescission would unfairly disrupt the reliance of BFI upon the baseline levels of long-term minimum delivery.

The litigation produced a split decision. Casella achieved a declaratory judgment enabling it to decrease its delivery obligation to baseline tonnage through the end of 2014. BFI defeated the claim of rescission and successfully maintained the core delivery term and the agreement itself throughout that long span. During the nearly three years of litigation before trial, Casella agreed to maintain deliveries at a level protecting BFI from shortfall penalties. In addition, BFI won the benefit of a substantial notice period and gradual decreases from the enhanced delivery figures. This divided outcome precludes either side from the usual status of "prevailing party."

*Conclusion.* The text of the contract contained an ambiguity. The ambiguity concealed the omission of a term useful to the parties but not essential to their objectives. The judge appropriately filled the omission with a term serving the main purposes of both parties and preserving the agreement as a rational business instrument.

*Judgment affirmed.*