NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-956

RAUHAUS FREEDENFELD & ASSOCIATES, LLP

vs.

CARROLLTON WEST PET HOSPITAL.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Rauhaus Freedenfeld & Associates, LLP (RFA), brought this action against the defendant, Carrollton West Pet Hospital (CWPH), alleging breach of contract, violation of G. L. c. 93A, and various quasi contract claims.  Following a five-day bench trial, a Superior Court judge entered judgment in favor of RFA.  CWPH appeals, challenging the manner in which the judge determined RFA's damages.  We affirm.

Background.  We summarize the facts as set forth in the judge's findings, supplemented by uncontroverted facts drawn from the exhibits.

1.  Project origins.  RFA is an architectural firm in Boston that is nationally recognized for its expertise in the

design of veterinary facilities.  Among the firm's principals is Warren Freedenfeld, whose professional practice has focused on the design of large veterinary hospitals.

CWPH is an animal hospital in Carrollton, Texas, owned by Lynda Van Antwerp, DVM, and managed by Ross Barnes.  In 2011, Barnes approached RFA about designing a two-level, 9,000 square foot animal care facility adjacent to CWPH's existing veterinary hospital (project).  From the outset, Barnes told RFA that CWPH wanted the new facility to be "the best of the best."  Among other things, Barnes envisioned a waiting area with a waterfall, an aquarium large enough to hold sea turtles, a bone-shaped pond with a paw print island in the middle, and a residential unit that would allow Barnes and Van Antwerp to live on-site.  Barnes stated that although CWPH had a $3.3 million budget, "price was no object."[1]

2.  The contract.  On July 21, 2011, CWPH and RFA executed a standard form owner-architect agreement (contract),[2] which the parties modified in limited ways.  The cover page of the contract stated that it was "for [c]onstruction [p]rojects of

---

[1] Van Antwerp was aware that Barnes had made this statement but later expressed that Freedenfeld "did not take this comment in the context it was offered."

[2] Specifically, the template agreement they used was the 1987 edition of the "Abbreviated Form of Agreement Between Owner and Architect" by the American Institute of Architects.

[l]imited [s]cope," and warned that it had "important legal consequences" and that "consultation with an attorney is encouraged."

a.  Project phases.  The contract divided the project into three phases:  the "design phase," the "construction documents phase," and the "construction phase -- administration of the construction contract."  Only the first two phases are relevant to the present appeal because the parties severed their relationship before construction began.

With respect to the design phase, the parties agreed that, after "review[ing] with [CWPH] alternative approaches to design and construction of the [p]roject," RFA would prepare "[d]esign [d]ocuments" for CWPH's approval, "consisting of drawings and other documents" consistent with the parties' "mutually agreed-upon program, schedule and construction budget requirements" and "shall submit . . . a preliminary estimate of [c]onstruction [c]ost."  This construction cost estimate would be "based on square foot area of the [p]roject."

In the construction documents phase, RFA agreed to prepare, "[b]ased on the approved [d]esign [d]ocuments, . . . [c]onstruction [d]ocuments consisting of [d]rawings and [s]pecifications setting forth in detail the requirements for the construction of the [p]roject and [RFA] shall advise [CWPH] of any adjustments to previous preliminary estimates of

3

[c]onstruction [c]ost."  Once CWPH approved the construction documents and the latest preliminary cost estimate, RFA agreed to assist CWPH in obtaining bids or negotiated proposals and in preparing and awarding contracts for construction.

The contract also included provisions addressing additional services compensable beyond RFA's base fee, including "detailed [c]onstruction [c]ost estimates;" a 1.8 percent interest rate on amounts due; and payment of counsel fees in the event of breach. "Revisions requested by [CWPH] after the completion of any previously approved portion of the [a]rchitects [s]ervices, or of the [p]roject" were specifically identified as hourly billable additional services.  The contract also provided that CWPH's failure to make payments constitutes "substantial nonperformance."

b.  <u>Compensation framework</u>.  RFA's compensation "for basic services" in the design and construction documents phases was set at the greater of "8% of the construction cost or $18 per square foot," setting the "preliminary construction cost" at $200 per square foot.  In turn, the contract defined "the [c]onstruction [c]ost" as "the total cost or estimated cost to [CWPH] of all elements of the [p]roject designed or specified by [RFA]."

Specific payment milestones distributed RFA's total fee across project subphases:  programming ($3,500 fixed fee for a

4

project area of over 10,000 square feet), schematic design (thirty percent), construction documents (fifty-five percent), bidding and negotiation (five percent), and construction administration (ten percent).

3. Project design phase. After executing the contract, Freedenfeld met with Barnes and Van Antwerp to develop the project program. On November 18, 2011, Barnes sent Freedenfeld a series of photographs depicting his vision for the facility: a European-style chateau with steeply pitched roofs, intricate masonry, a great hall, and ornate finishes.

RFA issued the first version of the project program on November 21, 2011, dividing the project into two phases, and reflecting a total project area of 21,887 square feet.[3] A cover letter accompanying the program noted that the first phase was estimated to cost more than $2 million over CWPH's initial articulated budget. Freedenfeld then had "numerous discussions" with Barnes and Van Antwerp concerning ways to reduce the project's square footage. On December 9, 2011, RFA sent CWPH a revised project program, this time reflecting a total project area of 17,575 square feet. On December 17, 2011, Barnes and Van Antwerp approved the revised project program thereby

---

[3] The first project program is dated November 21, 2012, but there does not appear to be any dispute that it was sent to CWPH on November 21, 2011.

5

allowing the schematic design phase to proceed.  Barnes wrote "3.3 million budget" next to his signature.

On January 12, 2012, Freedenfeld presented an initial schematic design to Van Antwerp and Barnes, reflecting a two-phase project with a total gross area of 19,032 square feet.[4] Neither Barnes nor Van Antwerp requested a reduction in the size of the project, though they asked for interior layout adjustments and additional amenities.

Freedenfeld incorporated the requested changes and presented a second schematic design on January 31, 2012, increasing the total gross area to 19,322 square feet "due to the addition of [an] added corridor."  CWPH requested further upgrades and aesthetic enhancements -- including a dog exercise area, gazebo with fountain, wildlife refuge, and larger windows -- and instructed that "[t]he entire site should be designed to resemble an English Garden."  The second schematic design was then approved and on February 15, 2012, RFA sent CWPH revised floor plans, reflecting the improvements CWPH had requested.

_____

[4] At trial, Freedenfeld explained that projects typically include a thirty percent factor to account for exterior walls, interior partitions, and circulation, and that these considerations, in part, caused the gross area of the project to increase.  Barnes requested a twenty-five percent factor and RFA submitted calculations reflecting both twenty-five and thirty percent factors in the schematics.

6

RFA informed CWPH that it was going to advance to the construction documents phase.

4. <u>Construction documents and cost estimation</u>. Once the construction documents were close to being completed, RFA selected ICI Construction (ICI) to prepare a cost estimate for the project to address Barnes's "concerns over the cost that [Freedenfeld] was building into [the] project." On August 20, 2012, Freedenfeld forwarded ICI's estimate of $7.2 million to Barnes, which Barnes rebuffed as "grossly inaccurate."

In October 2012, Barnes asked Freedenfeld to send the construction documents to another contractor, Tri-Star Construction, Inc. (Tri-Star), for bidding. Freedenfeld refused, asserting that they had agreed no contractor would be solicited for additional bids until RFA incorporated CWPH's latest requested changes.

The parties' communications thereafter revealed a fundamental disagreement over CWPH's payment obligations. CWPH refused to pay an advance to RFA, asserting it was unwarranted because the construction documents were incomplete and unapproved, and that the latest round of revisions were part of RFA's basic services. CWPH further maintained, based on Barnes's personal calculations, that it had already paid RFA the majority of its total fee. RFA countered that the redesign requests represented significant compensable changes. Despite

7

the dispute, in November 2012, CWPH requested thirty-one material upgrades and eleven area increases.

In December 2012, RFA solicited bids -- all were in excess of $7 million.

5. <u>Breakdown of relationship and 2013 litigation</u>. After the bids came in, RFA invoiced CWPH for a balance due of approximately $237,030, based on RFA's total base fee calculated at eight percent of a construction cost of $7,165,361 (which was the lowest bid received during the bid solicitation).[5] Based on Barnes's belief that the bids were unreasonable and had been solicited without proper approval, CWPH refused to pay the invoice. RFA treated the nonpayment as a material breach and, after unsuccessful efforts to resolve the dispute informally, filed suit in April 2013.

6. <u>The 2014 addendum</u>. While the 2013 litigation was still pending, the parties attempted to resolve their dispute without the assistance of counsel and, on July 16, 2014, executed a written addendum to the original contract. The addendum provided, inter alia, that RFA's base fee would remain eight percent of the construction cost as calculated on the "lowest responsible bid" received for the project, and that CWPH retained the right of final approval of the successful bidder.

---

[5] The "first bid matrix" was not in the record at trial.

8

The addendum did not define the term "lowest responsible bid" or specify what would happen if the parties disagreed on which bid met that term.[6]

7. <u>Rebid and renewed dispute</u>. In October 2015, RFA rebid the project with agreed-upon changes to the plans. Ultimately, nine contractors submitted bids ranging from approximately $3.9 million to $7.9 million. RFA analyzed the submissions and determined that the lowest "responsible bid" that included "a complete schedule of values for each line item, no conflicts or inconsistencies in the numbers, reference checks, responsiveness of bidders to RFA's requests for further information, and . . . a reasonable cost per square foot," had been submitted by Tri-Star, the contractor from whom CWPH had previously sought a bid, at approximately $7.29 million. CWPH, however, insisted that Dunvegan Construction (Dunvegan), which bid approximately $3.99 million, was the "lowest responsible bidder," despite RFA's documented concerns about Dunvegan's limited qualifications and the incomplete scope of its bid.[7]

---

[6] The parties voluntarily dismissed the 2013 action, though there is no documentation in this record.

[7] Freedenfeld testified that the Dunvegan bid included an estimated cost per square foot that was unreasonable and stated that CWPH planned to complete the exterior site work itself.

RFA invoiced CWPH for its fee based on eight percent of the Tri-Star bid, representing compensation for all work performed to date. CWPH refused to pay. RFA then issued a supplemental invoice for $38,087 in additional services, reflecting the work it had performed to incorporate the latest changes. In September 2016, after the parties' relationship had fully deteriorated, RFA filed the instant suit to recover its unpaid fees.[8]

8. <u>Trial</u>. A bench trial commenced in February 2023. On June 30, 2023, the trial judge issued his findings of fact, rulings of law, and order for judgment. The judge found the addendum to the contract "fundamentally flawed" and unenforceable because there was no meeting of the minds on essential terms; to wit, how to "define 'lowest responsible bid'" or the mechanism for resolving disputes about the bid process. The judge reasoned that the evidence showed that Freedenfeld, who was "far better qualified," believed he would determine the lowest responsible bid, whereas Barnes believed CWPH could unilaterally select the lowest bidder based simply on price. Because the parties did not agree on who had final

---

[8] While this action was pending, the parties executed a limited stipulation allowing CWPH to use RFA's plans to complete construction, after payment by CWPH to RFA of $50,000 and deposit of $350,000 in escrow pending resolution of RFA's claims.

10

decision-making authority, and the addendum lacked a method to resolve such a dispute, the judge deemed the addendum unenforceable and that the parties' rights were governed by the contract.

The judge then analyzed the parties' conduct under the contract and found that CWPH committed a breach when it "unilaterally walked away from the [contract] in late 2015" without paying RFA the balance of its fee, and deciding, based on its own calculation of "estimated cost," that it had already paid RFA in full. The judge credited Freedenfeld's testimony as "an experienced architectural design professional . . . with decades of experience in this niche area of practice" and found that Tri-Star's bid of $7,287,167 reflected a "reasonable 'estimated cost'" of the project. The judge concluded that the total fee owed to RFA was $582,973.36, which, when reduced by ten percent for unperformed construction administration services and payments CWPH had already made of $404,702.76, left a balance due of $119,973.27, plus contractual interest of 1.8 percent per month from December 2015, bringing total damages to $314,329.97, inclusive of prejudgment interest. The judge also awarded RFA $146,584.40 in attorney's fees under the contract.

The judge also found that RFA was not entitled to payment of the $38,087 it later billed for additional services because Freedenfeld admitted that he had intended to perform the work as

11

a professional courtesy. The judge additionally concluded that CWPH's conduct did not rise to the level of a G. L. c. 93A violation, but merely reflected Barnes's lack of prior experience and unrealistic cost expectations rather than coercive tactics.

9. Postjudgment motions. After judgment entered for RFA, CWPH filed several postjudgment motions, including (1) a motion to alter or amend the judgment under Mass. R. Civ. P. 59 (e), 365 Mass. 827 (1974) (rule 59 [e] motion); and (2) a motion to take additional testimony as to current or projected construction cost, brought pursuant to Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974) (rule 59 [a] motion).

In support of its rule 59 (e) motion, CWPH asserted that in view of the judge's recognition that the purpose of the addendum was to move the project forward and reduce construction costs, it was error to void the addendum rather than insert a curative term or, in the alternative, that the payment terms in the contract were just as ambiguous as the payment terms in the addendum insofar as the contract did not identify "who gets to select between the 'total cost' or 'estimated cost' for purposes of calculating RFA's fee."

In its companion rule 59 (a) motion, CWPH asked the judge to take additional testimony from Barnes and Mike Villalobos (the principal of the project's general contractor since 2019)

12

regarding the project's current and projected total construction cost, or alternatively, to stay execution of the judgment until construction was complete so that the judge could consider the final cost.

The judge denied CWPH's motions and reiterated that the addendum was unenforceable because there was no meeting of the minds on essential terms, and that the contract terms were "not so latently ambiguous as to prevent proper calculation of damages."  This appeal followed.[9]

Discussion.  "The interpretation of a contract is a question of law, which we review de novo."  James B. Nutter & Co. v. Estate of Murphy, 478 Mass. 664, 667 (2018).

---

[9] CWPH noticed an appeal from the judgment and from the postjudgment order denying its rule 59 (e) motion; however, CWPH's appeal from the latter is waived because it did not set forth any specific argument in its brief regarding that order. See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019) ("The appellate court need not pass upon questions or issues not argued in the brief").  To the extent that CWPH also purports to appeal from the postjudgment orders that denied CWPH's rule 59 (a) motion and granted RFA's request for attorney's fees, those orders were not included in CWPH's notice of appeal.  Accordingly, they are not properly before us.  See Mass. R. A. P. 3 (c) (1) (A), as appearing in 491 Mass. 1601 (2023) ("The notice of appeal shall designate . . . in civil cases, the judgment, decree, adjudication, or separately appealable order from which the appeal is taken"); Robinson v. Boston, 71 Mass. App. Ct. 765, 771 (2008), quoting Siles v. Travenol Labs., Inc., 13 Mass. App. Ct. 354, 354 n.1 (1982) (judgment or order not designated in notice of appeal "is not properly before this court").  Although those orders are not before us, we nevertheless briefly address CWPH's arguments pertaining to them.

13

1. The addendum. The judge found that because there was no meeting of the minds as to the essential terms of the addendum, it is unenforceable and the contract is thus the controlling document between the parties. Although CWPH initially challenged this finding, it withdrew its reliance on the addendum at oral argument and in writing thereafter. Accordingly, we need not discuss the addendum further.

2. Calculation of RFA's fee under the contract.[10] The judge found that because the project was only fifty percent complete at the time of trial in 2023, "the '[c]onstruction [c]ost' of the [p]roject under [a]rticle 5.1.1 must be calculated using the 'estimated cost' of the [p]roject." CWPH argues that the contract must be read "assum[ing] the project will be constructed," and that the term "construction cost" should be construed to be the actual cost of construction; therefore, CWPH contends, the judge erred by basing RFA's fee on estimated construction costs. We are not persuaded. As the judge noted, under the contract, "construction cost" is defined in article 5.1.1 as "the total cost <u>or estimated cost</u> to the [o]wner of all elements of the [p]roject as designed or

---

[10] The judge found that CWPH committed a breach of the contract by moving forward with the project after refusing to pay RFA's fees. CWPH does not challenge this finding on appeal.

14

specified by the architect" (emphasis added).[11]  This definition

allows for flexibility in computation of cost, permitting

calculation based on estimated cost before a project's

completion.

CWPH argues, relatedly, that the judge erred in denying its

postjudgment rule 59 (a) motion to reopen the record to take

testimony regarding the actual construction costs for the fifty

percent of the project that had been completed.  However, where

the construction was not complete, cost thus far was of no

relevance; actual cost of the entire project could not be

ascertained, and some amount of estimation would have been

required.  Additionally, the judge found that CWPH committed a

material breach of the contract before construction began, a

finding not challenged by CWPH, and prior to any actual costs

being incurred; therefore, we agree that the use of estimated

cost in the calculation of RFA's fee as of the time of the

breach in 2015 was appropriate.

CWPH also argues that the judge's analysis of the contract

was flawed because he failed to read the contract as a whole by

ignoring that the term "estimated costs" is explicitly used to

---

[11] CWPH argues, without support, that because the term "Construction Cost" appears within the agreement both with capital Cs and with lower case Cs, the terms were intended to have materially different meanings.  We do not read any material difference into the term based on capitalization.

15

calculate RFA's fee only twice in the contract: when the owner decides to provide materials or perform work personally on the project, or when portions of the project are not constructed. CWPH argues that, other than in these two provisions, only actual construction costs are used for calculating payment. To be sure, when interpreting a contract, it "is to be construed so as to give it effect as a rational business instrument . . . , [and] the parties' intent must be gathered from a fair construction of the contract as a whole and not by special emphasis upon any one part" (quotations and citations omitted). Kingstown Corp. v. Black Cat Cranberry Corp., 65 Mass. App. Ct. 154, 158 (2005). However, a reading of the contract as a whole shows that the parties contemplated that payments would be made to RFA throughout the term of the relationship and prior to completion of the project. The parties specifically agreed that "progress payments" of a percentage of the construction cost would be made upon the completion of the schematic design and the construction documents phases. Indeed, ninety percent of RFA's fee was to be paid before the construction phase of the project began. Also, the parties agreed that the "[a]rchitect shall be entitled to compensation in accordance with this [a]greement for all services performed whether or not the [c]onstruction [p]hase is commenced" (emphasis added). Clearly,

the parties intended for payment to be made to RFA even if the construction did not take place.

We also agree with the judge that the calculation of estimated cost, and RFA's fee therefrom, must be based on a reasonable bid and not simply the lowest bid, and that the Tri-Star bid of $7,287,167 was a reasonable estimated construction cost because (1) the cost per square foot is reasonable based on Freedenfeld's testimony as credited by the judge; (2) the bid is close to the amount of the initial bid offered by ICI; (3) the bid is in the same general range as the first round of bids; and (4) the Tri-Star bid is the lowest of the three bids that Freedenfeld, in his professional opinion, found to be reasonable.

3. Ambiguity. CWPH further argues that the contract is flawed because, like the addendum, it does not specify which party has ultimate decision-making authority over whether estimated cost or total cost is used in determining the fee, creating contractual ambiguity.[12]  We disagree.  "The mere existence of the parties' disagreement does not make the language ambiguous."  Browning-Ferris Indus., Inc. v. Casella Waste Mgt. of Mass., Inc., 79 Mass. App. Ct. 300, 307 (2011).

_____

[12] We note that the judge did not find that the addendum was ambiguous, but rather that there was no meeting of the minds as to its terms.

17

"Contractual language is ambiguous if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one" (quotation and citation omitted). James B. Nutter & Co., 478 Mass. at 669. As discussed, the flexible "construction cost" definition ensures that a fee can be ascertained throughout the project's phases and if the construction phase is never commenced. There is no ambiguity.

4. Attorney's fees. CWPH argues that in awarding attorney's fees to RFA, the judge erred in applying the contractual attorney's fees provision. CWPH concedes, however, that after the judge found that CWPH's breach of the agreement entitled RFA to an award of attorney's fees, RFA submitted a motion for fees, supported by an affidavit, which CWPH did not oppose. "An issue not raised or argued below may not be argued for the first time on appeal" (citation omitted). Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006). Moreover, on this record, we are unable to discern whether the issue of attorney's fees was addressed at the hearing held on the postjudgment motions. If that issue was indeed heard, it was CWPH's obligation, as the appellant, to provide a hearing transcript, but no transcript was provided. See Mass. R. A. P. 18 (b) (4), as appearing in 481 Mass. 1637 (2019). Finally, CWPH's notice of appeal did not designate the postjudgment order

18

awarding fees.  Thus, that order is not properly before us.  See Robinson v. Boston, 71 Mass. App. Ct. 765, 771 (2008).[13]

                                        Judgment affirmed.

                                        By the Court (Massing,
                                          Sacks & Allen, JJ.[14]),

                                        *Paul Little*

                                        Clerk


Entered:  April 30, 2026.

---

[13] RFA's request for appellate attorney's fees is denied.

[14] The panelists are listed in order of seniority.

19